720 A.2d 711

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Orlando BAEZ, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 17, 1996.

Decided Nov. 23, 1998.

Reargument Denied Jan. 26, 1999.

68

72

Thelia Jean Eaby, Lancater, for O. Baez.

John A. Kenneff, Millersville, Robert A. Graci, Atty. Gen., for Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION OF THE COURT

CASTILLE, Justice.

Following a jury trial in the Lancaster County Court of Common Pleas, appellant was found guilty of first-degree murder in the death of Janice Williams.[1] On March 27, 1993, following a sentencing hearing, the jury unanimously found two aggravating circumstances and further found that these aggravating circumstances outweighed the three mitigating circumstances.[2] The jury then imposed the penalty of death. Subsequently, new counsel was appointed and post-verdict motions were filed. On February 5, 1996, the trial court denied appellant's post-verdict motions. Pursuant to 42 Pa. C.S. § 9711(h), this Court has automatic jurisdiction to review the trial court's judgment of a sentence of death.

As in all cases in which the death penalty has been imposed, this Court is required to independently undertake a review of the sufficiency of the evidence. *Commonwealth v.*

1. 18 Pa.C.S. § 2502(a).

2. The two aggravating circumstances that the jury found were: (1) the defendant committed a killing while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); and (2) the offense was committed by means of torture, 42 Pa.C.S. § 9711(d)(8). The mitigating circumstances found by the jury were: (1) no significant history of prior convictions, 42 Pa.C.S. § 9711(e)(1); (2) any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense, 42 Pa.C.S. § 9711(e)(8); and (3) mercy, 42 Pa.C.S. § 9711(e)(8).

*Zettlemoyer,* 500 Pa. 16, 26–27 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). The standard for reviewing the sufficiency of the evidence is whether the evidence admitted at trial and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to support all the elements of the offenses beyond a reasonable doubt. *Commonwealth v. Carpenter,* 511 Pa. 429, 435, 515 A.2d 531, 533–34 (1986).

■ Evidence is sufficient to sustain a conviction for first-degree murder where the Commonwealth establishes that the defendant acted with a specific intent to kill, that a human being was unlawfully killed, that the person accused did the killing, and that the killing was done with deliberation. 18 Pa.C.S. § 2502(d); *Commonwealth v. Mitchell,* 528 Pa. 546, 550, 599 A.2d 624, 626 (1991). After a review of the record, we find that the following evidence is sufficient to support appellant's conviction.

On the night of January 5, 1987, appellant and Henry Gibson ("Gibson") visited Janice Williams in her apartment on East King Street in Lancaster County, Pennsylvania. Gibson testified that when he and appellant first arrived, they observed the victim's two children asleep on the couch. Subsequently, appellant asked to speak to Williams in the bedroom. Gibson, who remained in the living room, testified that approximately fifteen minutes later, he heard loud voices, a "thump," and the victim screaming, "he's killing me." Gibson immediately ran to the bedroom, where he saw appellant standing over the victim, stabbing her repeatedly with a knife. Gibson testified that both appellant and the victim were nude from the waist down. Upon noticing Gibson in the room, appellant threatened Gibson that if he did not leave, appellant would kill him as well. Gibson immediately exited the apartment.

Approximately five minutes after Gibson exited the apartment and began walking towards his home, appellant caught up to him and tried to give him a knife with a broken handle. When Gibson refused to take the knife, appellant threw it

down a nearby sewer drain. Appellant and Gibson walked together to appellant's residence, where appellant further threatened Gibson that if he ever said anything about what he had seen, appellant would implicate Gibson in the murder.

The next morning, the victim's young children discovered their mother's dead body and summoned a nearby pedestrian. After entering the apartment and observing the victim, the pedestrian called the police. The police arrived shortly thereafter and found the victim on her bed. An autopsy was conducted, revealing that the victim had suffered blunt force trauma injuries to her head and had been stabbed fifty-eight times in her chest, back and abdomen, fifteen times in her face, and twenty-eight times in her torso. Also, her throat had been slit.

On the front door of the victim's apartment, Lancaster County police officers collected a bloody fingerprint sample. Expert testimony established a match between this fingerprint and fingerprints that had been taken from appellant. During the autopsy of the victim, a pubic hair was recovered from the victim's vagina. Expert testimony established that this hair shared the same "microscopic characteristics" as hair samples taken from appellant in 1988 and 1992,[3] and that it was "very unlikely" to find two individuals who shared the same microscopic characteristics. The testimony also established that the hair sample from the victim's vagina was *inconsistent* with Gibson's hair type.

In late 1991, over four years after the murder had occurred, Gibson informed police that appellant had killed the victim. Gibson testified that he reported the murder at that late date because he was tired of being threatened and afraid. In February of 1992, in spite of appellant's repeated denials of involvement and denials that he had ever been in the victim's apartment, appellant was arrested and charged with the murder. At the time of his arrest, appellant again denied that he had ever been in the victim's apartment or that he even knew

3. The 1988 samples had been taken in connection with an earlier arrest for different criminal conduct; the 1992 samples had been taken pursuant to the arrest for this murder.

84

the victim. However, at trial, appellant testified that he had engaged in consensual intercourse with the victim but that Gibson had subsequently killed her.

The aforementioned evidence, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to establish beyond a reasonable doubt that appellant deliberately stabbed the victim over one hundred times, including multiple stabbings on vital parts of the victim's body. In light of the overwhelming physical evidence, which corroborated Gibson's eyewitness testimony, the jury was entitled to disbelieve appellant's account of the night in question, which itself conflicted with appellant's prior accounts. The jury was entitled to infer appellant's specific intent to kill based on, *inter alia,* his use of a deadly weapon upon a vital part of the victim's body. *See Commonwealth v. Butler,* 446 Pa. 374, 378, 288 A.2d 800, 802 (1972). Thus, the evidence is sufficient to establish that appellant unlawfully and deliberately caused the victim's death. *See* 18 Pa.C.S. § 2502(d); *Commonwealth v. Mitchell,* 528 Pa. 546, 550, 599 A.2d 624, 626 (1991).

## DENIAL OF PRE-TRIAL MOTION TO SUPPRESS APPELLANT'S STATEMENTS

Appellant argues that the trial court erred by failing to suppress his post-arrest exculpatory statements denying the murder and professing his ignorance of the victim's address.[4] Specifically, appellant urges that his post-arrest statements should have been suppressed because: (1) police detectives did not administer *Miranda* warnings to him before he made the statements in question; (2) the statements were involuntarily uttered; and, (3) the statements were improperly obtained after appellant specifically invoked his right to remain silent. In reviewing a ruling on a suppression motion, the standard of review is whether the factual findings and legal conclusions drawn therefrom are supported by the evidence. *Commonwealth v. Bond,* 539 Pa. 299, 305–07, 652 A.2d

4. The Commonwealth used appellant's statements of denial to impeach appellant's testimony at trial that he *had* been at the victim's apartment on the night of the murder but that he was not the murderer.

308, 311 (1995). A suppression court's error regarding failure to suppress statements by the accused will not require reversal if the Commonwealth can establish beyond a reasonable doubt that the error was harmless. *See Commonwealth v. Fay*, 463 Pa. 158, 161, 344 A.2d 473, 474 (1975).

It is well established in Pennsylvania that volunteered or spontaneous utterances are admissible even though the declarant was not "Mirandized." [5] *Commonwealth v. Bracey*, 501 Pa. 356, 369, 461 A.2d 775, 782 (1983); *Commonwealth v. Yount*, 455 Pa. 303, 314 A.2d 242 (1974); *Commonwealth v. Clark*, 454 Pa. 329, 311 A.2d 910, 913 (1973)(this Court held that statements were admissible when blurted out spontaneously while appellant was being given Miranda warnings).

Here, the record reveals that after Lancaster County police officers arrested appellant on February 24, 1992, they took him to the police station and placed him in a holding cell. Subsequently, officers moved appellant to an office in the detectives' division for questioning. As a detective began reading appellant his *Miranda* rights, appellant interrupted the detective, proclaimed his innocence and stated that he had never been to the victim's apartment. After this unsolicited statement, appellant made a telephone call lasting twenty-seven minutes. Subsequently, as detectives repeatedly tried to inform him that they could not discuss his case unless he knowingly waived his *Miranda* rights, appellant again proclaimed his innocence and asserted that he had never been to the victim's apartment. Although appellant's statements were made before he was fully "Mirandized," the record amply supports the suppression court's finding that the statements were spontaneously volunteered while investigators were attempting to give appellant his Miranda warnings and immediately after appellant completed his phone call. Therefore, the statements were properly admitted. Moreover, the trial court properly admitted several other exculpatory statements that appellant made to police before his arrest (and after he had

5. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

been fully Mirandized) which were virtually identical in substance to the challenged statements. Hence, even if the challenged statements were improperly admitted, the error was harmless.

Appellant next argues that even if the statements were spontaneously uttered, they were nevertheless involuntarily uttered since they were the product of an inherently coercive environment. Specifically, appellant claims that the initial combination of being arrested, forced to wear handcuffs, and confined, coupled with the subsequent confrontation by two detectives in an enclosed office while he was suffering from an injury to his finger,[6] caused him to involuntarily make the exculpatory statements in question.

There is no single litmus-paper test in determining the voluntariness of a statement; it must be established that the decision to speak was the product of free and unrestrained choice by its maker. *See Commonwealth v. Hughes,* 521 Pa. 423, 442, 555 A.2d 1264, 1273 (1989). All attendant circumstances surrounding the confession must be considered, including: the duration and methods of the interrogation; the length of the delay between arrest and arraignment; the conditions of detainment; the attitudes of police toward the defendant; the defendant's physical and psychological state; and all other conditions present which may serve to drain one's power of resistance to suggestion or undermine one's self-determination. *See id.* Here, appellant's spontaneous utterances were not rendered involuntary simply because he had a pair of handcuffs on his hands and a minor preexisting cut on his finger. Even if they had been involuntarily uttered, we note again that such putative error would be harmless beyond a reasonable doubt since appellant's virtually identical pre-arrest denials were properly admitted.

**6.** Appellant had a cut on his index finger from a prior accident with a saw. Medication for this cut was administered while appellant was in custody. Appellant does not allege that the injury caused him undue discomfort or disorientation which resulted in his statements being involuntarily coerced.

██ Appellant next argues that after the police told him they wanted to speak with him about the incident, he invoked his right to remain silent when he stated "f___, no, I don't want to talk about anything," in the course of proclaiming his innocence. Appellant contends that at that point he should have been promptly returned to the holding cell and the police should not have engaged him in further conversations. However, after appellant made this statement, detectives did *not* interrogate him any further. Instead, detectives allowed him to make a telephone call which lasted twenty-seven minutes. Immediately after this telephone call, appellant spontaneously reiterated his innocence and his assertion that he had never been in the victim's apartment. Since the detectives did not take any action designed to elicit these statements, they did not in any way infringe on appellant's right to remain silent. *See Bracey, supra,* at 369, 461 A.2d at 782 (spontaneous utterances admissible even after suspect has invoked his right to remain silent). Therefore, the suppression court committed no error in regard to the challenged statements.[7]

## ALLEGATIONS OF ERROR DURING THE GUILT PHASE

Appellant alleges that the trial court erred during the guilt phase of his trial by allowing the Commonwealth to introduce testimony concerning blood, hair, and fingerprint samples collected from him during the 1988 investigation of an unrelated rape charge. Specifically, appellant argues that the testimony regarding the 1988 samples was improperly admitted because it suggested to the jury that appellant was involved in prior criminal activity.

██ While evidence of other crimes is not admissible to prove criminal character or propensity to commit crime, it may be admissible for other purposes. *Commonwealth v. Morris,* 493 Pa. 164, 425 A.2d 715, 719–20 (1981). Evidence of

7. In a separately headed claim, appellant further alleges that the trial court erred by denying his motion for a mistrial based on the prosecutor's statements pertaining to his right to remain silent. This claim, which is more properly presented as a claim of prosecutorial misconduct, is addressed *infra.*

88

a distinct crime is admissible if offered to prove, *inter alia*, motive, intent, or the identity of the person charged with the commission of the crime being tried. *Id.* at 720. Evidence introduced for this purpose is admissible if its probative value tends to outweigh its prejudicial value. *Id.* We are mindful throughout this analysis of the presumption in our law that the jury follows the trial court's instructions. *Commonwealth v. Steele*, 522 Pa. 61, 78, 559 A.2d 904, 913 (1989).

Here, no witness ever indicated that the 1988 samples stemmed from investigation of appellant's involvement in a separate criminal matter.[8] Since the victim was killed in 1987, evidence of samples taken in 1988 merely tended to demonstrate that a police investigation was underway as a result of the victim's death. Thus, we find that appellant suffered no prejudice as a result of the challenged testimony. To the extent that appellant suffered any prejudice, we find that such prejudice was substantially outweighed by the probative value of this testimony on the issue of appellant's identity—the issue with respect to which this testimony was properly offered. *See Morris, supra,* at 164, 425 A.2d at 719–20 (1981). The Commonwealth's expert on hair and fiber analysis offered uncontradicted testimony that the closer to the time of the crime a hair sample is taken, the more reliable the test results will be with respect to the issue of identity. Thus, the trial court did not err by allowing witnesses to refer to the 1988 samples.

Appellant additionally urges that the prosecutor explicitly indicated that the 1988 and 1992 hair and blood samples were from different cases, thereby prejudicing him directly. Specifically, he points to the following question posed by the prosecutor while cross-examining a defense expert: "Doctor, maybe the problem is there are two separate cases, 1988 and 1992,

---

**8.** The most notable reference by any witness that could possibly connect the 1988 sample with separate criminal activity was the testimony of the detective who collected the samples in 1988. The detective stated that a hair sample was "marked K–10 and it has the incident number, assignment number, 493065, on it." However, this testimony does not suggest that the hair sample or the assignment number were connected to a *separate* criminal investigation.

both with [identification number] K–5 on them?" Immediately following this question, a side-bar conference was held, during which defense counsel requested a mistrial. Defense counsel refused the prosecutor's offer to rephrase the question, stating that this would be more prejudicial because it would further highlight the previous inappropriate comment. The court denied appellant's motion for a mistrial. Following the side-bar conference, the prosecutor rephrased the question as follows:

> Doctor, just to try to clarify this, apparently the FBI used two separate case numbers and there is subsequently K numbers from '88 and K numbers from '92. My question to you is, which pubic hairs did you measure?

The rephrasing suggests that the FBI used two separate case numbers because there were two separate samples, not because there were two separate criminal investigations.

Moreover, at the end of the court session at issue, the court issued a curative instruction regarding the prosecutor's question.[9] The trial court also repeated the instruction it had given at the beginning of the trial—that a prosecutor's statements and questions do not constitute evidence and that the jury should disregard any reference that was not in accord with their recollection of the testimony. In light of the rephrasing of the question and the curative instruction which

**9.** The Court issued the following curative instruction to the jury regarding this matter:

> Before we adjourn though, as I told you at the beginning of this trial, you as the jury are the fact finders. It's your recollection of the facts that controls, not my recollection nor that of the attorneys representing the parties. In your deliberation you must rely upon your own memories of what witnesses said.
>
> There was an issue raised in the course of questions posed of the defendant's fiber expert as to the content and extent of testimony of the FBI expert concerning the characteristics of the hair that he examined. Again, the Assistant District Attorney in posing the questions was relying upon his memory. It's your memory of what was said that is important. So if there is something that he raised which was not included in the testimony as you recall it to be, then you are to disregard references to that.
>
> As I told you before, it is the answers as given by witnesses on the stand that is testimony that you are to consider, not the questions posed.

the jury is presumed to have followed, we find that no prejudice accrued to appellant as a result of the prosecutor's initial question.

Appellant next argues that the trial court erred in allowing Tina Chirinos ("Chirinos") to testify that appellant had stated to her that she was a "bitch" just like the victim and that she had reported appellant's statement to the police in 1989.[10] Appellant's premise is that this evidence somehow suggested that he had been involved in prior criminal activity with respect to Chirinos.[11] Appellant further argues that even if such evidence alone is deemed insufficient to suggest that appellant was involved in a prior criminal act, the combination of this testimony with Chirinos' breaking down and crying on the witness stand improperly suggested that Chirinos was the victim of prior criminal activity by appellant.

Having carefully reviewed the testimony and conduct alluded to by appellant, we find that the testimony itself did not in any way indicate that appellant was involved in a prior criminal episode with Ms. Chirinos. To the contrary, the evidence suggests that appellant and Chirinos were involved in an ordinary relationship. Thus, appellant did not suffer any undue prejudice as a result of Chirinos' testimony or conduct. Additionally, since the testimony at issue tended to establish the hostility that appellant felt towards the victim, the evidence was highly probative with respect to the issues of motive and intent, particularly since appellant had told detec-

10. Prior to trial, appellant's counsel preserved this issue by objecting to Chirinos' proposed line of testimony. The trial court found that her testimony was not unduly prejudicial and that it was relevant because it was necessary to refute appellant's previous statements to police that he had little or no contact with the victim, Janice Williams.

11. Chirinos had indeed complained to the police in 1989 that appellant had raped her in his apartment, and informed them that the statement regarding the victim had been made when appellant glanced up at a picture of her during the rape. However, the record reveals that the trial court strictly limited Chirinos' testimony at trial. Chirinos never offered any testimony that suggested in any way that appellant's statement was made in the course of a separate criminal episode. Instead, Chirinos offered testimony suggesting that the statement was uttered while she was lying on appellant's bed after she had been out on an ordinary date with him.

tives that he did not know the victim at all. Accordingly, to the extent that appellant suffered any prejudice from the putative implication of prior criminal activity, such prejudice was substantially outweighed by the probative value of the testimony with respect to motive and intent—two of the permissible purposes for which evidence of prior crimes may be adduced. *See Morris, supra,* at 164, 425 A.2d at 719–20. In sum, the trial court did not err by allowing Tina Chirinos to testify.

 Appellant next argues that the trial court erred in allowing the testimony of appellant's former roommates, Shirley Toomey, Wendy Sanchez and Elba Sanchez, that appellant used his right hand when he performed ordinary life activities.[12] Specifically, appellant claims that these witnesses improperly suggested the occurrence of prior unrelated criminal episodes involving appellant.[13] However, the trial court limited the testimony of these witnesses to whether they had observed appellant performing ordinary activities with his right hand, and the ensuing testimony did not suggest prior criminal activity at all. To the extent that the testimony could be construed as prejudicial in any way, we find that such prejudice was substantially outweighed by the probative value of this testimony with respect to the issue of identity, since appellant claimed that he could not possibly have committed the crime in view of his being left-handed. Therefore, we find this claim to be without merit.[14]

Appellant next argues that the trial court erroneously limited defense counsel's ability to impeach witness Henry Gibson,

12. Evidence presented at trial suggested that the assailant had stabbed the victim with the right hand. Appellant claimed at trial that he was left-handed.

13. Appellant's counsel objected to each of these witnesses' testimony on the basis that unrelated criminal activity would be revealed. The trial court overruled the objections because it found that appellant would not suffer undue prejudice from any of this testimony and that each witness' testimony was relevant for purposes of rebutting appellant's claim that he was left-handed.

14. Appellant also alleges that the cumulative effect of errors in allowing prior crimes evidence warrants a new trial. Because there is no error with regard to any of these issues, appellant's claim is without merit.

thereby violating appellant's right under the Sixth Amendment to the United States Constitution to confront witnesses against him. Specifically, appellant argues that he should have been allowed to prove Gibson's alleged cocaine use at the time of and before the murder by calling impeachment witnesses. Also, appellant alleges that he should have been permitted to cross-examine and impeach Gibson about Gibson's physical and sexual abuse of Valerie King.[15]

First, appellant claims that the evidence of prior cocaine use was relevant to rebut the prosecutor's suggestion in his opening statement that Gibson had developed a cocaine and alcohol problem only subsequent to the murder, and had gone to the police because his guilt at having witnessed the murder was at the root of his ongoing cocaine problem.[16] The trial court allowed appellant to cross-examine Gibson with regard to whether he had used cocaine before 1987 (when the murder

15. Defense counsel represented that in the event that Gibson denied these allegations on cross-examination, he was prepared to present witnesses who would have verified Gibson's pre-existing alcohol and cocaine problems as well as his abusive behavior towards women. Among the proffered witnesses were Valerie King and Detective Jan Walters, who would have testified to an assault Gibson committed against King (his then-girlfriend) that resulted in the filing of criminal assault charges and a protection from abuse order. The trial court determined that defense counsel could cross-examine Gibson concerning his prior cocaine use insofar as it related to his seeking treatment for drug addiction, but did not allow cross-examination regarding the assault charges filed by King and the subsequent protective order. See T.T. at 1165–68, 1915–16, 2043–44. The trial court refused to allow the defense to call any impeachment witnesses to testify regarding Gibson's prior cocaine use, finding this to be a collateral issue. See T.T. at 1685. Defense counsel objected to these restrictions on cross-examination and impeachment.

16. In his opening statement, the prosecutor commented on Gibson's motivation for going to the police as follows:

He tells the police that he had a cocaine and alcohol problem over the course of the years since the death of Janice Williams and that in the summer of 1991 he obtained some treatment for that problem and that he was advised by the counselor at the treatment center that in order to get this problem behind him, he would have to get off his chest whatever it was that was bothering him. And he says that this is the force which caused him to call the police in early January, 1992.

See T.T. at 982. The prosecutor elicited testimony from Gibson to support this theory. See T.T. at 1100–1105.

had occurred), as well as the extent of any such usage. *See* T.T. at 1136, 1170, 1177–78, 1182–85. Gibson consistently denied any significant cocaine usage prior to the murder, consistent with the theme of the prosecutor's opening statement that Gibson's cocaine problem dated to the time of the murder. Defense counsel sought to call witnesses who would testify to the severity of Gibson's cocaine problem in the years before the murder, and made an offer of proof to that end. Over counsel's objection, the trial court determined that such impeachment testimony was not warranted since it related to a collateral issue.

 Appellant claims that Gibson's testimony regarding prior cocaine use concerned not a collateral issue, but the central issue of whether Gibson had indeed been a witness to a murder committed by appellant, since the witness claimed that the cocaine abuse allegedly dated to and was caused by his witnessing the murder. A trial judge must deal with evidentiary questions such as this in light of the purposes of the ultimate inquiry and does so in the exercise of judicial discretion. *Levinson v. Commonwealth,* 395 Pa. 613, 615, 151 A.2d 453, 455 (1959)(quoting *Thompson v. American Steel and Wire Co.,* 317 Pa. 7, 11, 175 A. 541, 543 (1934)). A trial judge should take care that nothing relevant is excluded, so long as its admission will not unduly distract the attention of the jury from its main inquiry. *See id.* A trial judge must determine whether evidence which, though logically relevant on the ultimate issue, may nevertheless be excluded because its general effect on the trial will be to confuse the jury by distracting its attention away from the jury's primary concern to the collateral issues. *Id.* Because of the often difficult nature of this task, the judge's conclusion or decision on such points will not be interfered with on appeal save for abuse of discretion. *See id.*

 Here, a review of the record reveals no abuse of discretion which would warrant reversal on this evidentiary issue. Even if the issue of Gibson's prior cocaine use was a non-collateral issue under the circumstances of this case, it

was of limited relevance to the ultimate issue of whether appellant committed first-degree murder. Assuming that the prosecutor was correct in asserting in his opening statement that Gibson's cocaine use dated to the time of the murder, logic dictates that the cocaine abuse could have stemmed either from Gibson's trauma due to witnessing the murder or from his guilt due to committing the murder himself, the latter alternative being consistent with the theory of appellant's defense.[17] The simple fact that Gibson began to abuse cocaine after the murder does not tend to either establish or disestablish that it was appellant and not Gibson who committed the murder. Consequently, impeachment testimony that purported to establish the timeframe of Gibson's cocaine use would also have been of no consequence. The jury could very well have believed Gibson's testimony regarding his witnessing the murder without believing that his witnessing the murder caused the drug usage. Allowing the testimony of the proffered impeachment witnesses would have served to "unduly distract the attention of the jury from the main inquiry" and required "the ascertainment of an unnecessary quantity of subordinate facts," particularly given the limited and non-probative inferences that could be drawn from Gibson's testimony regarding cocaine abuse. *See id.* In sum, we find no abuse of discretion in the decision of the trial judge to limit impeachment of Gibson on the issue of the timeframe of his prior cocaine abuse.

Second, regarding the prior criminal complaint filed by Valerie King against Gibson with respect to an alleged assault, appellant claims that by exploring this prior allegation, he could have established that Gibson was biased and that his testimony was motivated by his fear of being accused of the murder himself, since he had been accused of similar violent crimes against women in the past. Appellant claims that by

17. The prosecutor's theory was that Gibson witnessed the murder. Appellant's theory was that Gibson committed the murder. The fact that Gibson began abusing cocaine after the murder, if believed, simply would not help a reasonable juror select one of these theories over the other. In this regard, we note that the prosecutor did not tell the jury what inference it should draw from the proffered fact that Gibson's cocaine use dated to the time of the murder.

precluding any such inquiry of Gibson, the trial court improperly denied appellant the protections of the Sixth Amendment.

In *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the United States Supreme Court reviewed a challenge to a trial judge's limitations on cross-examination of a material witness under the Sixth Amendment's Confrontation Clause. The appellant in *Davis* had been accused of stealing a safe from a bar. Richard Green, a crucial prosecution witness, testified that he had seen appellant standing by a blue Chevrolet with "something like a crowbar" in his hands near the same spot in which the safe was later found with its contents removed. The safe was found near the home of Green's stepfather, with whom Green resided. The trial judge granted the prosecutor's motion for a protective order seeking to exclude reference to Green's prior adjudication of delinquency for burglarizing two cabins. On the strength of Green's testimony and physical evidence showing that paint chips in the trunk of the appellant's rented Chevrolet could have originated from the stolen safe, the appellant was convicted of burglary and grand larceny.

The United States Supreme Court determined that the appellant had been denied his Sixth Amendment right to confront witnesses against him when the trial court refused to allow impeachment of Green for bias stemming from his own conviction for burglary. The Court explained:

> The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony." We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.
>
> . . . .
>
> The claim of bias which the defense sought to develop here was admissible to afford a basis for an inference of undue pressure because of Green's vulnerable status as a probationer, as well as of Green's possible concern that he might be a subject in the investigation ... While counsel was

permitted to ask Green whether he was biased, counsel was unable to make a record from which to argue why Green might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial ... counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of a witness.

*Id.* at 316–17, 94 S.Ct. 1105.

■■■ Here, appellant argues that the same principles that guided the Supreme Court in *Davis* mandate the conclusion that he was denied his Sixth Amendment right to probe Gibson for bias on the basis of assault charges that Gibson's ex-girlfriend, Valerie King, had filed against him. We disagree. In *Davis,* the Supreme Court held that cross-examination of a crucial witness had been improperly limited so as to preclude reference to that witness' prior *conviction* and the fact that the witness was presently on *probation.* Since defense counsel was prohibited from making any inquiry as to whether the witness was presently on probation, the witness' "categorical denial of ever having been the subject of any similar law-enforcement interrogation went unchallenged." *Id.* at 313, 94 S.Ct. 1105. Here, appellant does not aver that Gibson was ever convicted of assault, or that Gibson was serving a period of probation. Appellant merely urges that the prior filing of a criminal complaint against Gibson—which was subsequently discontinued by the complainant—might have motivated or biased Gibson's testimony in this case. Appellant fails to offer a rational argument as to how Gibson might have been biased to testify against appellant as a result of these prior unrelated charges which were not prosecuted nor outstanding. In essence, appellant invites us to create new law which would allow a witness' character to be blackened in any criminal trial simply if an allegation was ever raised against the witness in the past regarding criminal activity. Such a sweeping rule of law would likely result in an endless series of minitrials regarding the merits of unrelated allegations of criminality against the witness. Moreover, the

outcome of these distracting sideshows would not materially advance the inquiry into the witness' possible bias or motive in testifying. Therefore, we find that the trial judge did not abuse his discretion by refusing to allow testimony on the collateral issue of whether Gibson previously assaulted a woman.

 Appellant next argues that the trial court erred by allowing certain black-and-white photographs and a black-and-white video to be shown to the jury during the guilt phase. The admissibility of photographic or videotaped evidence depicting a crime scene is within the sound discretion of the trial court and only an abuse of that discretion will constitute reversible error. *Commonwealth v. Buehl,* 510 Pa. 363, 391, 508 A.2d 1167, 1181 (1986). The admissibility of photographs involves a two-step analysis. First, the court must decide whether a photograph is inflammatory by its very nature. If the photograph is deemed inflammatory, the court must determine whether the essential evidentiary value of the photograph outweighs the likelihood that the photograph will improperly inflame the minds and passions of the jury. *See Commonwealth v. Marshall,* 537 Pa. 336, 341, 643 A.2d 1070, 1075 (1994).

 Appellant first contends that four evidentiary photographs of the victim which emphasized the way in which the victim's arms and legs were spread were unduly inflammatory to the jury and prejudicial to appellant. The four black-and-white photographs at issue were offered by the Commonwealth to corroborate the description of Detective Dennis Arnold regarding the crime scene and the condition in which the victim was found. Furthermore, defense counsel called a pathologist to testify as to the conclusions that could be drawn from the blood smear patterns seen on the victim in the photographs. The Commonwealth also called a pathologist who drew contrary conclusions to those of the defense expert. The photographs provided the jury with a point of reference by which to evaluate the testimony of these conflicting expert witnesses. The jury viewed two of the photographs for ap-

proximately twenty-seven (27) seconds and the other two photographs for forty-one (41) seconds. The jury was not permitted to take the photographs with them when they adjourned to deliberate. In light of the dispute between the pathologists and the limited extent to which these photographs were viewed by the jury, we find that the trial court did not abuse its discretion by determining that the evidentiary value of the photographs outweighed the possible prejudicial effect.[18] Accordingly, this claim merits no relief.

Next, appellant contends that the trial court erred by allowing jurors to view a black-and-white video depicting the victim's body. Appellant urges that the video should have been excluded because it was unduly inflammatory and merely cumulative of the photographs previously shown. However, both the defense and the prosecution participated in redacting inflammatory portions of the video. Moreover, the court issued a limiting instruction to the jury prior to showing the video, cautioning the jurors as to its narrow relevance and clearly instructing them not to allow the video to stir their emotions to the prejudice of the defendant.[19] Since the jury is

18. Even if the photographs had not related directly to the dispute between the pathologists, they would have been admissible for their probative value concerning the issue of appellant's specific intent to kill, notwithstanding the prejudicial effect. *See Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367 (1991), *cert. denied*, 502 U.S. 959, 112 S.Ct. 422, 116 L.Ed.2d 442 (1991); *Commonwealth v. Laird*, 526 Pa. 578, 585, 587 A.2d 1367, 1374 (1991)(color photograph depicting a close view of the corpse was admitted to prove intent to kill in a first-degree murder case); *Commonwealth v. Rush*, 538 Pa. 104, 646 A.2d 557 (1994)(photographs of the murdered victim's body provided the jury with evidence of the assailant's intent); *Commonwealth v. Buehl*, 510 Pa. 363, 508 A.2d 1167 (1986)(black-and-white photographs admitted at trial were relevant as they depicted the victims as they were found and demonstrated the position of appellant when the fatal shots were fired).

19. The trial court instructed the jury as follows:

Before viewing the video, the video you're about to see was admitted in evidence for the purpose of showing conditions of the scene of the alleged crime and helping you understand the testimony of the witnesses who referred to—several witnesses have referred to portions of the scene and there have been references to the fact that some witnesses have based some of their testimony on the video, video that your going to review.

presumed to follow the court's instructions, *Steele, supra,* at 61, 559 A.2d at 913, we find that the trial court did not err by allowing the video to be shown.

## ALLEGATIONS OF ERROR DURING
## THE PENALTY PHASE

Appellant next argues that the trial court erred by allowing the Commonwealth's forensic pathologist to testify with regard to the duration of the attack and the victim's pain and suffering in an attempt to establish the aggravating circumstance of torture. Appellant contends that the expert's testimony was based upon pure speculation because it was: (1) beyond his area of expertise; (2) based upon secondary information gleaned from other individuals' observations of victims prior to death; and (3) not based upon a reasonable degree of medical certainty. We find that this claim does not merit relief.

The qualification of an expert witness is a matter within the sound discretion of the trial court and will be reversed only for a clear abuse of discretion. *Commonwealth v. Bennett,* 471 Pa. 419, 423, 370 A.2d 373, 375 (1977). It is well established in Pennsylvania that the standard for qualification of an expert is a liberal one and the test to be applied is whether the witness has a reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight of that testimony is for the trier of fact to determine. *Commonwealth v. Gonzalez,* 519 Pa. 116, 128, 546 A.2d 26, 31 (1988). It is also well established that an expert may render an opinion based on training and experience; formal education on the subject matter is not required. *Miller v. Brass Rail Tavern, Inc.,* 541 Pa. 474, 480–81, 664 A.2d 525, 528 (1995).

> It's not a pleasant video to look at. You should not let it stir your emotions to the prejudice of the defendant. Your verdict must be based on a rational, fair consideration of all of the evidence and not on passion or prejudice against the defendant, the Commonwealth or anyone else connected with this case.

■ Here, during the guilt phase of appellant's trial, Dr. Mihalakis was qualified and testified as a forensic pathologist without any objection or *voir dire* cross-examination from appellant's trial counsel.[20] During questioning of Dr. Mihalakis at the penalty phase, he testified as to his experience and knowledge in investigating the circumstances leading up to death and the ultimate causes of death.[21] Thereafter, over defense counsel's objection, the trial court qualified Dr. Mihalakis as an expert to assist the jury in determining the duration of the attack and the amount of pain and suffering that a typical person would have experienced as a result of the stab wounds inflicted during this attack. After reviewing Dr. Mihalakis' testimony concerning his expertise regarding the issues on which he provided testimony, we find that the trial

**20.** During the guilt phase of appellant's trial, Dr. Mihalakis testified that his credentials included: (1) fours years of medical school; (2) a two-year internship; (3) a four-year residency, which was a formal training program for pathology; (4) two years as staff pathologist at an army hospital; (5) three years as assistant medical examiner for the State of Maryland; (6) twelve years as staff pathologist at Sacred Heart Hospital in Allentown, Pennsylvania; (7) director of post-mortem examination services at Lehigh Valley Hospital for the past ten years where he and his associates perform autopsies for ten counties of this Commonwealth; (8) board certification as a forensic pathologist in 1971; (9) practicing as a forensic pathologist for over twenty-two years; (10) being previously certified as an expert forensic pathologist in Maryland, Missouri, New York and New Jersey; and, (11) being previously certified as an expert forensic pathologist in all the eastern counties of this Commonwealth.

**21.** Dr. Mihalakis testified that he had previously been qualified and testified as an expert to assist juries regarding the amount of pain and suffering caused by certain types of wounds between twenty and thirty times during the sentencing phases of capital cases. Dr. Mihalakis further testified that his experience in this subject matter stemmed from his training and education in the medical field in general. Moreover, Dr. Mihalakis elaborated upon how his experience on the specific issue of the pain and suffering stemming from certain types of wounds had been enhanced by information that he had obtained over his thirty-year career as an emergency room resident and as a forensic pathologist, including numerous first-hand explorations and evaluations into the causes of death and the circumstances leading up to death. He also gleaned information from discussions with paramedics, emergency room physicians, witnesses to deaths, and statements obtained from victims prior to their deaths.

court did not abuse its discretion by qualifying Dr. Mihalakis as an expert.

■ Appellant also alleges that the testimony actually proffered by Dr. Mihalakis was not within a reasonable degree of medical certainty, as it must be under the prevailing standard. *See Commonwealth v. Edmiston,* 535 Pa. 210, 222–23, 634 A.2d 1078, 1084 (1993). We do not require experts to use "magic words" when expressing their opinions. *Mitzelfelt v. Kamrin,* 526 Pa. 54, 66, 584 A.2d 888, 894 (1990). Instead, we look to the substance of their testimony to determine whether it meets the requisite standard. *Id.*

■ Here, Dr. Mihalakis testified that the person who had inflicted the stab wounds obviously knew how to cause death, but that forty-three (43) of these wounds were of a small, non-fatal variety. Based on his experience, Dr. Mihalakis testified that these wounds were more consistent with an attempt to cause pain than an attempt to cause death. Consistent with this testimony, Dr. Mihalakis testified further to the likelihood that the victim did not die instantaneously and was conscious during at least part of the attack, as well as the possible sequence of the infliction of the fifty-eight (58) stab wounds, forty-three (43) jab wounds, two (2) cuts, and the blunt force injuries that the victim suffered. Although Dr. Mihalakis did not express his opinion in the exact terms of the legal standard, his testimony indicates that his opinions were based on a reasonable degree of medical certainty rather than mere speculation. Thus, appellant's claim fails.

Appellant further argues that the trial court's error in declining to restrict Dr. Mihalakis' testimony was compounded by its vague jury instruction on the aggravating circumstance of torture. However, a review of the charge reveals that it is identical to the very definition of torture that this Court provided in *Commonwealth v. Chester,* 526 Pa. 578, 587 A.2d 1367 (1991).[22] Appellant fails to establish that the definition

**22.** In *Chester,* this Court stated:

> To establish the aggravating circumstance of torture, the Commonwealth must prove that the defendant intended to inflict a considera-

upheld in *Chester* was improper. Therefore, this claim does not merit relief.

■ Appellant next claims that the trial court erred by allowing certain color photographs to be referenced during the sentencing phase of the trial because they were unduly prejudicial. However, appellant admits that the photographs at issue were never submitted to the jury during their deliberations. In fact, appellant admits that the jury never viewed these photographs at all. Therefore, even assuming that the trial court erred by admitting these photographs—an issue on which we make no finding—such error was patently harmless and this claim is frivolous since the jurors never observed them.

## IV. *ALLEGATIONS OF PROSECUTORIAL MISCONDUCT*

■ Appellant next contends that the trial court erred by denying his numerous motions for mistrial based upon allegations of prosecutorial misconduct. It is within the discretion of the trial court to determine whether a defendant has been prejudiced by misconduct or impropriety to the extent that a mistrial is warranted. *Commonwealth v. Simmons*, 541 Pa. 211, 246–47, 662 A.2d 621, 638 (1995). Comments by a prosecutor do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a true verdict. *Commonwealth v. Sam*, 535 Pa. 350, 362, 635 A.2d 603, 608 (1993), *cert. denied*, 511 U.S. 1115, 114 S.Ct. 2123, 128 L.Ed.2d 678 (1994); *Commonwealth v. Jones*, 530 Pa. 591, 607, 610 A.2d 931, 938–39 (1992).

ble amount of pain and suffering on the victim which is unnecessarily heinous, atrocious, or cruel, manifesting exceptional depravity. This proof is separate from that which supports a finding of a specific intent to kill. Implicit in this definition of torture is the concept that the pain and suffering imposed on the victim was unnecessary, or more than needed to effectuate the demise of the victim.
*Id.* at 606, 587 A.2d at 1381 (citations omitted).

■ In considering appellant's claims of prosecutorial misconduct, we note that a prosecutor's comments do not constitute evidence. *LaCava, supra,* at 181, 666 A.2d at 231 (citing *Commonwealth v. Green,* 525 Pa. 424, 461, 581 A.2d 544, 562 (1990)). Considering the aforementioned standard, we find that the following challenged comments and conduct were not improper.

■ First, appellant argues that the prosecutor during summation improperly referred to an inadmissible hearsay statement made by Commonwealth witness Lisa Lytle, a friend of the victim.[23] Appellant argues that the trial court sustained a defense objection to a portion of Lytle's testimony regarding the victim's negative reaction to appellant on several occasions as being based on inadmissible hearsay. Therefore, appellant avers that the following portion of the prosecutor's summation was based on inadmissible hearsay:

> The second incident[24] at Patsy's Cafe offered by Lisa Lytle; come with me, you're coming home with me, an obscene gesture, a big argument. People intercede. Interested desire for. Was that desire reciprocated? A negative is a hard thing to prove but what do we know from Lisa Lytle? Yeah, we ran into him downtown from time to time, he'd come up and start talking to Janice and she used the expression a young person uses, oh. That was Janice's reaction, Oh [sic]. I don't want to be with him, that type of reaction is not what Mr. Baez is suggesting to you.

Although appellant correctly notes that the trial court sustained an objection as to a portion of Lytle's testimony, a review of the record indicates that the prosecutor was able to properly elicit that Lytle directly observed the victim's negative reaction towards appellant on several occasions. Thus, the prosecutor appropriately laid a foundation for the argu-

23. The Commonwealth offered Lytle's testimony to contradict appellant's assertions that he was engaged in an ongoing relationship with the victim.

24. The first incident referred to by the prosecutor was an incident at the Elk's club which is discussed in the next section of this opinion.

ment he made in the challenged portion of his summation. Accordingly, this claim merits no relief.

■ Appellant next argues that the prosecutor committed prosecutorial misconduct by stating that an incident which occurred at the Elk's Club [25] preceded an incident that occurred at Patsy's Cafe, thus unfairly and improperly suggesting an escalating pattern of violence by appellant that culminated in murder. However, the relevant portion of the summation indicates that the prosecutor did not rank the incidents in order of time; rather, the prosecutor merely listed the incidents in the order in which they had been presented at trial. Moreover, the prosecutor did not argue that there was an escalating pattern of violence. Therefore, this claim of prosecutorial misconduct does not merit relief.

■ Appellant next argues that the prosecutor committed misconduct during his summation by stating that appellant had said to Tina Chirinos that the victim had ruined his life, when in fact Chirinos had only testified that appellant had stated, "you are a bitch just like the woman in the picture." *See* T.T. at 2410–11. A prosecutor's remarks must be evaluated in the context in which they occur. *Commonwealth v. Carpenter*, 533 Pa. 40, 48–49, 617 A.2d 1263, 1267 (1992). Viewed in context, we find that the discrepancy between the testimony as summarized and the testimony as proffered is inconsequential. The prosecutor qualified the challenged statement by immediately stating, "or words to that effect ..." T.T. at 2711. Since he qualified the statement, the prosecutor did not intend to perpetuate a fallacy in the minds of the jurors and therefore did not commit prosecutorial misconduct. *See Commonwealth v. Simmons*, 541 Pa. 211, 248, 662 A.2d 621, 639 (1995)(no prosecutorial misconduct where evidence does not show that misstatement of the fact was deliberate). Moreover, the jury was repeatedly cautioned by both the prosecutor and the trial court that they should rely exclusively upon their own recollection of the evidence,

**25.** Wanda Williams testified that approximately two months prior to the victim's death, she had accompanied the victim to the Elk's Club, where the victim repeated declined appellant's sexual advances.

not the recollection of the prosecutor or anyone else. The cumulative effect of these curative instructions was to remove any prejudice that might otherwise have inured by the prosecutor's inadvertent misstatement. *See id.* at 249, 662 A.2d at 640; *Commonwealth v. Talley,* 456 Pa. 574, 578, 318 A.2d 922, 924 (1974). Finally, we do not believe that the unavoidable effect of the comment at issue would be to "so prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a true verdict." *Commonwealth v. Sam,* 535 Pa. 350, 362, 635 A.2d 603, 608 (1993), *cert. denied,* 511 U.S. 1115, 114 S.Ct. 2123, 128 L.Ed.2d 678 (1994). Therefore, the challenged statement does not constitute prosecutorial misconduct warranting a new trial.

▮ Next, appellant argues that prosecutorial misconduct occurred when the prosecutor referred to portions of Gibson's statement to the police which had not been admitted into evidence. The prosecutor stated:

He [Gibson] said it was a late New Year's Eve party, the week after New Year's. Living on Spruce Street; he moved there in 1986. Chino had left a little early. Yeah, I went outside about 10:30. Delphine had to go to work. I had an argument. I decided to go out of the house to get away from it. Mr. Baez said lets take a walk. I say fine. He said there was a girl he wanted to see.

T.T. at 2731. Defense counsel immediately objected on the basis that the prosecutor was reading from Gibson's statement to police, which had not been moved into evidence. The trial court sustained the objection. The prosecutor then reminded the jury that it was their recollection of the evidence which was binding. A review of the entire transcript indicates that the prosecutor's statements amounted to a legitimate summary of Gibson's properly admitted testimony, since Gibson himself had testified to the facts that the prosecutor summarized. Therefore, the reference at issue did not constitute prosecutorial misconduct.

Next, appellant argues that the prosecutor committed prosecutorial misconduct during his closing argument by mischaracterizing appellant's testimony. Specifically, he alleges that the following portions of the prosecutor's summation were not based upon the evidence:

[Defense counsel] said something about touching the neck by Mr. Baez, getting the blood on his finger and that's how the blood got in the door where the blood print got on the door. That's not what Mr. Baez said. Mr. Baez said his leg was bleeding so profusely that blood from his own leg, remember he said that was my blood on the door, blood from his own leg is what got on his hand and what got on the door ... and he admitted that he's bleeding profusely or enough to go through the clothing and get it on his hands.

A review of the record reveals that the prosecutor's statements accurately represented appellant's testimony.[26] Thus, this claim does not merit relief.

Appellant next argues that the prosecutor committed prosecutorial misconduct when he summarized another part of appellant's testimony, relating to appellant's state of mind after Gibson allegedly stabbed the victim and then appellant, as follows: "[W]ell, I guess I had the presence of mind, this is somebody who is in a comatose mind, I guess I had the presence of mind to walk around the blood spots." T.T. at 2742. At trial, appellant had testified that: "I freaked out, I just froze, I was in a state of shock," and "I don't know. I tried, I might have tried not to step on [the blood]." T.T. at 2135 & 2241. Here, the use of the exact words to which appellant testified would not have diluted the point that the prosecutor was making—that someone with a "frozen" state of mind cannot very well engage in planned, deliberate activity. Therefore, we find that the prosecutor's use of the words "comatose mind" instead of "froze" or "state of shock" did not have the effect of unavoidably prejudicing the jury with fixed

26. Appellant testified that he had touched the victim's neck and lifted her head to see if she was still alive. T.T. at 2139–43. Moreover, appellant testified that he was bleeding profusely and the blood on his hands was from the stab wound to his leg. *Id.* at 2239–41.

bias and hostility towards appellant. Consequently, appellant is not entitled to relief on this claim.

Appellant next argues that during the prosecutor's summation, he improperly and intentionally referred to appellant's post-arrest silence in his closing statement to the jury. The complained-of reference occurred while the prosecutor was discussing appellant's defense that Gibson committed the murder while appellant was in another room in the victim's apartment. Specifically, the prosecutor stated:

> You're now arrested. You now know what the situation is. What do you do? Well, at this point you don't know that in addition to Henry Gibson there's other evidence. It's out on the table. You know what happened there. You are volunteering things to the police. Do you volunteer lies? Do you volunteer lies to the police or do you say I know what happened, I know who was there, I know what happened? Maybe you don't want to tell the police. Maybe you don't trust them enough to say it. Maybe you hold back but do you tell untruths? Do you tell things that he has admitted in the courtroom are untrue? You may say, I'm keeping it to myself. I'm waiting for trial but you don't tell lies unless you don't know what the evidence is.

T.T. at 2744–45. Appellant contends that by stating, "I'm keeping it to myself," the prosecutor improperly referred to appellant's post-arrest silence. However, the record reflects that the prosecutor was commenting not on appellant's post-arrest silence, but on his post-arrest *statements*. Once a suspect elects to respond to police questioning, the import of his responses is properly available for the jury's consideration. *Commonwealth v. Jermyn*, 516 Pa. 460, 475, 533 A.2d 74, 81 (1987). Since the prosecutor here was merely suggesting that certain conclusions could not be drawn from appellant's post-arrest statements, the prosecutor did not thereby engage in any misconduct and this claim merits no relief. Next, appellant argues that in his summation, the prosecutor committed prosecutorial misconduct by misstating the testimony of Ernie

Cole.[27] Specifically, appellant challenges the prosecutor's statement that Ernie Cole would have remembered if he had seen a blood-drenched Gibson returning to the house at 2:30 a.m.[28] Upon review of the record, we find that the prosecutor properly remarked upon Cole's failure to remember seeing Gibson on the night on question. The prosecutor did not in any way mischaracterize Cole's failed recollection. Therefore, appellant is not entitled to relief on this claim.

Appellant next argues that a new trial should be granted because the prosecutor committed prosecutorial misconduct by asking the following questions during the cross-examination of Delphine Rosario: [29]

Q. Now, did you keep butcher and kitchen knives around your house in 1987?

A. Sure I did.

Q. Did those knives from time to time turn up missing?

T.T. at 2365. Appellant contends that these questions were inappropriate because they suggested that knives may have been missing from Ms. Rosario's kitchen and that one of these missing knives may have been the murder weapon, which was never found.

However, even if this question was unfairly prejudicial—a point on which we make no judgment—the trial court immediately sustained defense counsel's objection to this ques-

---

**27.** Ernie Cole lived in the same house as Gibson during the relevant time period. He was offered as a defense witness to rebut Gibson's claim that he had spoken with Cole after returning home on the night of the killing. Mr. Cole testified that he did not remember seeing or having a conversation with Gibson on the night in question. *See* T.T. at 1993–94.

**28.** According to appellant's testimony, Gibson was covered with blood upon leaving the victim's apartment and, based on the time of departure, would have returned to his home before 2:30 a.m. The Coles testified that although they were awake at their home around 2:30 a.m., they did not remember seeing Gibson re-enter the house. The prosecutor properly surmised that if Gibson had indeed returned home before 2:30 a.m., covered with blood, the Coles would most likely have remembered seeing him.

**29.** Ms. Rosario was appellant's girlfriend and resided with him at the time of the murder.

tion, and it was never answered. Given that the question was not answered, and the court instructed the jury that questions posed by counsel are not themselves evidence, we find that the question at issue did not amount to prosecutorial misconduct warranting reversal. Accordingly, no relief is warranted.

Appellant next argues that the prosecutor committed prosecutorial misconduct during his cross-examination of Dr. Golub, a defense expert, and committed prosecutorial misconduct through his allegedly demeaning comments. First, appellant argues that the prosecutor improperly referred to a murder trial in which Dr. Golub had previously testified as a defense expert.[30] The prosecutor referred to the *Norton* case in an attempt to show that Dr. Golub's testimony in this case was inconsistent with his previous testimony in the *Norton* case. Specifically, the prosecutor sought to discredit Dr. Golub's current use and broad definition of the term "fiber analysis" by comparing it with his use and definition of the same term in *Norton. See* T.T. at 1835ff.[31] Appellant contends that this reference to the *Norton* case inflamed the jury with a fixed bias and hostility towards appellant because the jury may have inferred that Dr. Golub was responsible for the ultimate acquittal of the defendant in *Norton.*

We find that the passing reference to the *Norton* case did not unavoidably form a fixed bias and prejudice against appellant in the minds of the jurors. The *Norton* trial took place four years before appellant's trial. The prosecutor here did not comment at all upon the facts of *Norton,* other than to

**30.** The prosecutor referred to the case of *Commonwealth v. Timothy Norton,* Crim. Action No. 1365 (Lanc.Cty.1989), a controversial murder trial in Lancaster County in which the defendant was acquitted. Appellant offers numerous newspaper articles to support his allegation that the case was extremely controversial and well publicized. However, appellant fails to demonstrate in any way that the jurors here were familiar with the *Norton* case or verdict, much less that they were prejudiced against appellant's expert due to their familiarity with *Norton,* and even less that they were prejudiced against appellant himself as a result of the alleged prejudice against the expert.

**31.** The prosecutor explained that he was trying to show that Dr. Golub was "trying to bootstrap his experience in the fiber industry into being a hair expert when he is not." *See id.*

contrast the inconsistencies of a technical nature inherent in Dr. Golub's earlier testimony. Furthermore, the prosecutor never specified whether Dr. Golub testified for the defense or the Commonwealth in *Norton.* In sum, the prosecutor did not engage in misconduct at all, much less misconduct that would warrant a new trial, by simply referring to Dr. Golub's testimony in *Norton.* Therefore, this claim fails.

Second, appellant argues that the prosecutor's allegation that Dr. Golub had removed a Commonwealth evidentiary exhibit from the courtroom during this trial was designed to inflame the passions of the jury against Dr. Golub.[32] However, the record reveals that the challenged remarks were made while the jury was not present. Therefore, the jury could not have possibly been influenced by the prosecutor's allegations.

Finally, appellant alleges that the prosecutor's demeaning remarks during his cross-examination of Dr. Golub and in his summation constituted prosecutorial misconduct. However, after reviewing the record, we do not find that the prosecutor exceeded the appropriate level of civility at any point in time.[33]

**32.** During the trial, the Commonwealth lost a slide of a hair sample. The prosecutor alleged that Dr. Golub had taken the slide with him after he completed his testimony since he was the last one to use the slide. A court officer eventually found the slide in the projector.

**33.** Typical of the remarks about which appellant complains is the following reference to Dr. Golub during the prosecutor's summation:

I talked to you about Dr. Golub briefly before. I suggest to you that for all his qualifications, he simply is not qualified to do the hair analysis as performed by the FBI. Remember we listed eight of what he carried as fields of specialization on his resume. Not one dealing with hair. No training in hair analysis ... Does he have the right kind of not only qualification but as the FBI said does he have training? Does he have someone who checks his work? Does he take periodic tests to make sure that he is maintaining his skills? He does none of that. Compare that to the FBI.... I suggest to you that he's submitted for travelling to the county and also for testifying against the FBI for $200 an hour. Is that a bias or motivation to perhaps slant testimony a little bit ? ... One of the experts is wrong, and I suggest to you that it is Dr. Golub.

See T.T. at 2726–29. None of the prosecutor's comments comparing Dr. Golub's competence to that of the FBI expert, or addressing his possible bias and motive for testifying, were improper.

Finally, appellant argues that the cumulative effect of the aforementioned alleged prosecutorial misconduct requires the grant of a new trial. However, since we have determined that there was no prosecutorial misconduct, appellant is not entitled to relief on the basis of the asserted cumulative misconduct. *See also Commonwealth v. Murphy,* 540 Pa. 318, 657 A.2d 927 (1995)(no number of failed claims may collectively attain merit if they could not do so individually).

## ALLEGATIONS OF INEFFECTIVENESS OF COUNSEL

Appellant raises several claims of ineffective assistance of counsel. A criminal defendant sustains a claim of ineffectiveness of counsel by proving: (1) that the underlying claim is of arguable merit; (2) that counsel's performance had no reasonable basis; and, (3) that counsel's ineffectiveness worked to his prejudice. *Commonwealth v. LaCava,* 542 Pa. 160, 178, 666 A.2d 221, 229 (1995)(citing *Commonwealth v. Edmiston,* 535 Pa. 210, 237, 634 A.2d 1078, 1092 (1993)). Trial counsel's assistance is deemed constitutionally effective if the particular course chosen by counsel was reasonably designed to effectuate his clients' interests. *Commonwealth v. Pierce,* 515 Pa. 153, 158, 527 A.2d 973, 975 (1987). The law presumes that trial counsel was effective. *Commonwealth v. Miller,* 494 Pa. 229, 431 A.2d 233 (1981).

First, appellant alleges that trial counsel was ineffective for failing to impeach Henry Gibson with several prior inconsistent statements. In order to place appellant's specific claims in their proper context, we note that defense counsel conducted extensive cross-examination of Gibson on the following points, *inter alia:* (1) inconsistencies between trial testimony and earlier statements regarding Gibson's description of the knife that was used to commit the murder; (2) inconsistencies regarding his statements to others the night of the incident; (3) inconsistencies between trial testimony and his statement to a detective regarding whether he tried to stop appellant; (4) his falsehoods about his dishonorable discharge from the United States Marine Corps; (5) his setting false fire alarms; (6) his attempts to commit suicide by overdosing on drugs; (7) his conviction for robbery in California; (8) his violation of

112

conditions of his parole; (9) his pending charges of forgery; and (10) his abuse of alcohol and drugs. Trial counsel also called numerous witnesses to testify as to Gibson's bad reputation for truthfulness and honesty.

The first alleged discrepancy regards Gibson's preliminary hearing testimony that he saw a knife in appellant's hand as he stabbed the victim. During trial, Gibson denied seeing a knife in appellant's hand, and testified that he only saw appellant's bare hand moving in a stabbing motion. Trial counsel will not be deemed ineffective for failing to impeach a witness when such impeachment would only highlight damaging portions of the witness' testimony. *See Commonwealth v. Good*, 481 Pa. 529, 533, 393 A.2d 30, 32 (1978). Here, trial counsel acted reasonably in declining to pursue the inconsistency, since it would have focused the jury on the possibility that appellant had a knife in his hand at the time of the murder.

With respect to the second alleged inconsistency, Gibson testified at the preliminary hearing that he did not remember what color or type of coat he wore on the night of the murder. At trial, however, Gibson testified that he thought he had been wearing a blue coat with a hood. Appellant has failed to demonstrate that trial counsel acted unreasonably by declining to press this minor inconsistency.

Moreover, in light of the aforementioned attempts to impeach Gibson on numerous significant points, appellant has failed to demonstrate that the failure to seek to impeach Gibson on the inconsistencies at issue worked to his ultimate prejudice. Thus, appellant is entitled to no relief on his claims of ineffectiveness regarding prior inconsistent statements. *See Commonwealth v. Moore*, 534 Pa. 527, 633 A.2d 1119 (1993), *cert. denied*, 513 U.S. 1114, 115 S.Ct. 908, 130 L.Ed.2d 790 (1995) (attorney not ineffective for failing to impeach accomplice on minor inconsistencies between pre-trial statement and trial testimony).

Appellant next claims that his trial counsel was ineffective for failing to cross-examine Gibson with evidence that

Gibson had been incarcerated pursuant to bail orders issued under Pa.R.Crim.P. 4017.[34] Specifically, appellant urges that this evidence would have tended to show that Gibson was biased and had a motive to testify in a manner that would please the prosecutor. However, under Rule 4017, a material witness is under no further threat of incarceration or bail orders once that witness has testified, regardless of the content of the witness' testimony. Thus, appellant fails to demonstrate that counsel acted unreasonably by declining to argue that Gibson was biased because he was a Rule 4017 witness.

Appellant next claims that trial counsel was ineffective for stating in his closing argument during the guilt phase that Gibson washed his hands after the murder. Specifically, appellant argues that defense counsel undermined his own credibility with this assertion because appellant himself had provided uncontradicted testimony that Gibson was wearing gloves at all times on the night in question.

 Upon review of the record, it is clear that counsel's statement with respect to Gibson's handwashing was part of an attempt to account for the evidence showing that someone had washed blood from something at the sink in the kitchen area.[35] Trial counsel attempted to show that it could not have been appellant who washed off at the sink because appellant's bloody fingerprints were subsequently found on the door and the lock. Furthermore, appellant had testified that he did not

---

**34.** The bail orders issued in this case stem from the Commonwealth's proffer that Gibson was likely to flee the jurisdiction unless incarcerated. At the time of appellant's trial, Gibson was not incarcerated because he had posted adequate security. *See* Exhibits E–I.

**35.** Specifically, counsel argued as follows:

Now, come on, you heard Mr. Baez talking up here. Do you think that if he had been running around wiping his hands off up here, here and stood by the sink here with the dishwashing lotion next to him and the rag, now remember that rag had human blood on it but couldn't tell whose, okay, that he's going to wipe his hands off? He's going to wipe them off. He's not going to leave them bloody such that he puts—I mean you saw it, the blood that was on the lock out there and the fingerprint, if he's going to wash them he's going to wash them. Gibson washed his hands.

*See* T.T. at 1052.

go to the sink or wash any blood from his own hands. Therefore, in accounting for the blood in the sink, the only argument available to defense counsel was to suggest that Gibson—the only other person in the apartment—had washed himself off after having committed the murder. Appellant's own testimony that Gibson had been wearing gloves certainly inconvenienced this account, but this does not alter the fact that defense counsel pursued the only reasonable alternative available to him in light of his client's testimony and the physical evidence in the case.

Moreover, as stated above, the trial court repeatedly instructed the jury that arguments of counsel do not constitute evidence. The jury is presumed to follow the trial court's instructions. *Baker, supra,* 531 Pa. at 559, 614 A.2d at 672 (law presumes that juries follow the court's instructions as to the applicable law). In light of the trial court's instructions and the context of the remark at issue, the asserted inconsistency in defense counsel's argument did not prejudice appellant.

### DNA TESTING

 Appellant next argues that his conviction should be vacated pending the performance of DNA analysis on certain hairs found on the victim's body.[36] Specifically, appellant contends that the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as "general principles of justice," mandate that the conviction and sentence be vacated pending DNA testing.[37] Appellant cites

36. Appellant relies upon *Commonwealth v. Brison,* 421 Pa.Super. 442, 618 A.2d 420 (1992) as authority for his claim. In *Brison,* the trial court and Commonwealth repeatedly denied an indigent defendant's request for DNA testing. The Superior Court held that the trial court erred and that post-conviction DNA testing must be granted since the defendant was indigent and requested the testing, the conviction rested largely on identification evidence, and the advanced technology of DNA testing could definitely establish the defendant's innocence. Here, appellant has not requested DNA testing; rather, appellant requests that the trial court's judgment of sentence be vacated pending DNA testing.

37. Appellant did not request DNA testing to be performed at any time prior to trial or during trial. *See* PCRA Court Opin. at 35.

no case in which an appellate court vacated a conviction solely because DNA tests were pending, nor does he provide a substantial argument to demonstrate that DNA testing will likely reveal his innocence.[38] Appellant has not even made an offer of proof that it would be possible to conduct DNA testing in this case. In sum, appellant is not entitled to the speculative relief that he requests.

## *VENIRE PANEL SELECTION UNCONSTITUTIONAL*

 Appellant argues that his Sixth Amendment guarantee of an impartial jury trial was violated because minorities were under-represented on his jury venire panel.[39] Mere under-representation of a minority group on a jury panel does not constitute unconstitutional discrimination *per se*. *Commonwealth v. Jones*, 465 Pa. 473, 480, 350 A.2d 862, 866 (1976)(citing *Swain v. Alabama*, 380 U.S. 202, 208, 85 S.Ct. 824, 829, 13 L.Ed.2d 759 (1965)). To show that a jury selection system is unconstitutional, appellant must show that the procedures as designed or implemented are likely to result in juries unrepresentative of a cross-section of the community, or that the procedures have continually failed to represent certain identifiable groups over a period of time. *Commonwealth v. Jones*, 465 Pa. 473, 477, 350 A.2d 862, 865 (1976)(citing *Commonwealth v. Butler*, 448 Pa. 128, 133, 291 A.2d 89, 91 (1972)). Appellant fails to make the requisite showing with his bare, unsubstantiated assertion that his venire panel contained

---

**38.** Appellant's *request is based on his assertion that he explained to* trial counsel that he had only engaged in foreplay with the victim, but that trial counsel had instructed him to testify that he had engaged in consensual sexual relations with the victim. Consistent with his assertion, appellant urges that DNA testing will establish that the pubic hair found in the victim's vagina could not have been his. Appellant's premise that counsel urged him to lie is belied by exhibit number two—the public defender intake interview form—which indicates that appellant stated that he engaged in sexual intercourse with the victim. *See* N.T. PCRA Hearing at 48. We note further that expert testimony at trial established that the hair sample was consistent with hair samples taken from appellant in 1988 and 1992, and inconsistent with hair samples of Gibson—the only other person present in the apartment. *See* PCRA Court Opin. at 34, T.T. at 1577–78.

**39.** Appellant fails to provide information regarding the overall minority representation within the community.

two (2) minority members out of a total of eighty-four (84), without any mention of the procedures that were utilized to obtain this venire panel, and without any contention that certain identifiable groups have been underrepresented over time. Thus, appellant is not entitled to relief on this claim.

## BATSON CLAIM

Appellant next argues that the Commonwealth unlawfully used its peremptory challenges to exclude one prospective African–American juror and one prospective Hispanic juror from the final jury panel in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In order to establish a colorable *Batson* claim, appellant must first make a record identifying the race of the venire persons stricken by the Commonwealth, the race of prospective jurors acceptable to the Commonwealth but stricken by the defense, and the racial composition of the final jury. *Commonwealth v. Simmons*, 541 Pa. 211, 231, 662 A.2d 621, 631 (1995)(citing *Commonwealth v. Spence*, 534 Pa. 233, 246, 627 A.2d 1176, 1182–83 (1993)). Appellant has failed to meet the threshold requirement of developing a record of the race of the prospective jurors acceptable to the Commonwealth but stricken by the defense and has also failed to make a record of the racial composition of the final jury. Appellant does not establish that one of the two jurors at issue was a member of a cognizable group for purposes of a *Batson* challenge.[40] Thus, appellant has not stated a colorable *Batson* claim.

## JURY CHARGE AS TO UNANIMITY OF JURY VERDICT

Appellant next claims that he is entitled to a new sentencing hearing because the trial court erred by failing to clearly and thoroughly instruct the jury that they did not have to reach a unanimous verdict in order to sentence appellant to life im-

**40.** Appellant asserts that juror number 123 was stricken because she was an Hispanic–American. Even if this Court had held that Hispanic–Americans were a cognizable group for *Batson* purposes—which it has not—the record does not reveal that juror number 123 *was* of Hispanic origin. *See* N.T. Voir Dire 244–46.

prisonment rather than death. Appellant further argues that the verdict slip also improperly required unanimity for purposes of sentencing appellant to life imprisonment.

 A trial court's jury instruction constitutes reversible error only where there is an abuse of discretion or an inaccurate statement of law. *Commonwealth v. Jones*, 542 Pa. 464, 668 A.2d 491 (1995). Jury instructions must be taken as a whole and an error cannot be predicated on an isolated excerpt. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). Here, the trial court's jury instructions concerning unanimity were consistent with the procedures and instructions espoused by our legislature. Section 9711 of the Sentencing Code mandates that:

[A]fter a verdict of murder of the first degree is recorded and before the jury is discharged, the court shall conduct a separate sentencing hearing in which the jury shall determine whether the defendant shall be sentenced to death or life imprisonment.

42 Pa.C.S. § 9711(a)(1). Further, prior to the jury's consideration of the sentencing verdict, the court must instruct the jury that:

[T]he court may, in its discretion, discharge the jury if it is of the opinion that further deliberation will not result in a unanimous agreement as to the sentence, in which case the court shall sentence the defendant to life imprisonment.

42 Pa.C.S. § 9711(c)(1)(v). Thus, the sentencing code mandates that when the court determines that the jury cannot agree upon the verdict, the court must impose life imprisonment. A review of the record reveals that the trial court properly instructed the jury that the jury could return a less than unanimous verdict, and that the trial court would then be required by law to impose a sentence of life imprisonment.[41]

**41.** The trial court specifically instructed:

While you may return a unanimous verdict of life in prison or death it is your absolute right under the law not to agree on a unanimous verdict. If I then determine further deliberations will not lead to a unanimous verdict either of life imprisonment or death, I'm then

The trial court's instruction was a proper statement of the law. Consequently, appellant is not entitled to relief on this claim.

## CUMULATIVE ERROR

 Appellant suggests that in the aggregate, the arguments presented in his brief mandate reversal and a remand for a new trial. However, all of appellant's claims of error have failed for lack of merit. These individually meritless claims do not gain any merit merely because they are woven into one fabric for purposes of appellant's brief. *Commonwealth v. Murphy*, 540 Pa. 318, 657 A.2d 927 (1995)(no number of failed claims may collectively attain merit if they could not do so individually). Therefore, appellant is not entitled to any relief on this claim.

## SECOND SUFFICIENCY OF THE EVIDENCE REVIEW

Appellant urges that in cases where errors have been found but deemed harmless, this Court should undertake a second sufficiency of the evidence review under a more stringent standard. Again, since the Court has not found any error in this matter, we decline to adopt appellant's proposed method of further sufficiency of the evidence review.

## PROPORTIONALITY OF SENTENCE

 Finally, pursuant to 42 Pa.C.S. § 9711(h)(3), this Court has a duty to affirm the sentence of death unless we determine that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

required under the judicial code to impose a sentence of life imprisonment on Orlando Baez.

T.T. p. 3010. The trial court also clearly instructed the jury that unanimity is required in order to find an aggravating circumstance but not for purposes of finding a mitigating circumstance; the verdict slip reiterated this instruction. *See* T.T. at 3010, 3012 & 3015; Exb. J. of App.'s Brief.

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.[42]

42 Pa.C.S. § 9711(h)(3). After reviewing the record below, we conclude that the sentence imposed was not the product of passion, prejudice or any other arbitrary factor. In addition, the evidence supports the jury's unanimous finding of two aggravating circumstances—first, that appellant committed the killing while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6), and second, that appellant committed the killing by means of torture, 42 Pa.C.S. § 9711(d)(8). The Commonwealth presented evidence that appellant had repeatedly stabbed and slashed the victim while raping her. *See* T.T. at 1095ff., 1264ff, 2868–69. The evidence further established that the victim was conscious and alive while appellant was stabbing her with the knife with the intent of causing pain over and above that sufficient to cause death. *See id.* Thus, the evidence supported each of these aggravating circumstances.

Finally, in accordance with *Zettlemoyer, supra,* at 63, 454 A.2d at 961, we are required to conduct a proportionality review of the sentence.

This Court does not take lightly its statutory and constitutional duties and will conduct an independent evaluation of all cases decided since the effective date of the sentencing procedures under consideration (September 13, 1978). This independent review mandated by 42 Pa.C.S.A § 9711(h)(3)(iii) will utilize all available judicial resources and will encompass all similar cases, taking into consideration both the circumstances of the crime and the character and record of the defendant in order to determine whether

42. On June 25, 1997, the Governor signed legislation that repeals proportionality review from the death penalty statute by deleting all of subsection (h)(3)(iii) and a portion of subsection (h)(4). Act of June 25, 1997, No. 28, § 1 (Act 28). Section 3 of Act 28 states that "[t]his act shall take effect immediately." However, this Court has determined that Act 28 should not be applied to death penalty cases where the sentence of death was imposed prior to June 25, 1997. *Commonwealth v. Gribble,* 550 Pa. 62, 90 n. 19, 703 A.2d 426, 440 n. 19, 1997 Pa. LEXIS 2523, at *38 n. 19 (1997).

the sentence of death is excessive or disproportionate to the circumstances.

*Id.* In this regard, we have conducted our own proportionality review by independently examining similar cases, by reviewing the facts underlying the first degree murder, and by considering the sentencing data compiled by the Administrative Office of the Pennsylvania Courts (AOPC) pertaining to similar cases. We conclude that the sentence of death imposed upon appellant is not excessive or disproportionate to the sentences imposed in similar cases.[43] *See Commonwealth v. Frey,* 504 Pa. 428, 443, 475 A.2d 700, 707–08, *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984).

Accordingly, we affirm the verdict and sentence of death imposed upon appellant by the Court of Common Pleas of Lancaster County.[44]

Justice NIGRO files a concurring opinion.

NIGRO, Justice, concurring.

With the exception of footnote 40, which relates to the Majority's discussion of Appellant's *Batson* claim, I join the Majority's opinion.

---

**43.** *See, e.g., Commonwealth v. Marinelli,* 547 Pa. 294, 690 A.2d 203 (1997) (judgment of sentence of death affirmed where jury found as aggravating circumstance that the defendant committed the killing by means of torture and while in the perpetration of a felony and as mitigating circumstances that the defendant had no significant history of prior criminal convictions and the catchall provision); *Commonwealth v. Proctor,* 526 Pa. 246, 585 A.2d 454 (1991)(judgment of sentence of death affirmed where jury found as aggravating circumstance that the defendant committed the killing by means of torture and while in the perpetration of a felony and as mitigating circumstances that the defendant had no significant history of prior criminal convictions, past work history, and was influenced by another in committing the crime).

**44.** The Prothonotary of the Supreme Court is directed to transmit, as soon as possible, the complete record in this case to the Governor of Pennsylvania. 42 Pa.C.S. § 9711(i).