J-S71036-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MALIK ANDERSON | : | |
| | : | |
| Appellant | : | No. 425 EDA 2018 |

Appeal from the Judgment of Sentence October 15, 2014
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0011782-2013

BEFORE:  PANELLA, J., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:                **FILED FEBRUARY 19, 2019**

Appellant Malik Anderson appeals from the judgment of sentence entered following his convictions for first-degree murder, firearms not to be carried without a license, and possessing an instrument of crime (PIC).[1] Appellant asserts that the trial court erred in failing to suppress two statements he made to police.  Appellant also argues that his mandatory sentence of life imprisonment without the possibility of parole violates the Eighth Amendment of the United States Constitution and Article 1, § 13 of the Pennsylvania Constitution based upon the United States Supreme Court's ruling in **Miller v. Alabama**, 567 U.S. 460 (2012).[2]  We affirm.

---

[1] 18 Pa.C.S. §§ 2502(a), 6106(a)(1), and  907, respectively.

[2] In **Miller**, the United States Supreme Court held that a sentencing scheme that mandates life in prison without possibility of parole for juvenile homicide

The following is the relevant factual background to this matter.[3] Appellant, who was nineteen at the time of the crime, was charged with the shooting death of his friend, Daquan Crump, at a construction site in northeast Philadelphia on August 19, 2013. Crump had been shot eleven times in the head.

On August 20, 2013, Appellant's parents took him to the Homicide Unit, where detectives were gathering information from individuals who knew Crump. Detective James Griffin and Detective Hank Glenn conducted an interview during which they obtained information about Appellant's background and his relationship with Crump. Appellant was at the Homicide

_____

offenders is forbidden by the Eighth Amendment. **See Miller**, 567 U.S. at 470.

[3] On October 30, 2013, our Supreme Court decided **In re L.J.**, 79 A.3d 1083 (Pa. 2013). In **L.J.,** our Supreme Court held that the appellate scope of review of a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. **L.J.**, 79 A.3d at 1087. Prior to **L.J.,** this Court routinely held that, when reviewing a suppression court's ruling, our scope of review included "the evidence presented both at the suppression hearing and at trial." **See Commonwealth v. Charleston**, 16 A.3d 505, 516 (Pa. Super. 2011) (citing **Commonwealth v. Chacko**, 459 A.2d 311, 317 n.5 (Pa. 1983)). **L.J.** thus narrowed our scope of review of suppression court rulings to the evidence presented at the suppression hearing.

However, **L.J.** declared that the new procedural rule of law it announced was not retroactive, but was rather "prospective generally," meaning that the rule of law was applicable "to the parties in the case and [to] all litigation commenced thereafter." **L.J.,** 79 A.3d at 1089 n.19. Since the litigation in the instant case commenced before **L.J.** was filed, the new procedural rule of law announced in **L.J.** does not apply to the case at bar. **See id.** Accordingly, in summarizing the evidence, we may include evidence presented both during the suppression hearing and at trial.

Unit until the next evening, when he signed an exculpatory written statement indicating that he found out from a friend, "Niam," that Crump had died and that Appellant had last seen Crump at Appellant's house around midnight on the night he was killed, when Crump left Appellant and a group of friends to go elsewhere. Appellant was released on the evening of August 21, 2013, after spending nearly thirty hours at the Homicide Unit.

On August 23, 2013, police took statements from two witnesses indicating that Appellant had confessed to them that he had murdered Crump. Also on August 23, 2013, the police executed a search warrant at Appellant's home at 1810 Tomlinson Road in Philadelphia. In executing the search warrant, the police seized a gun belonging to Appellant. The Firearms Identification Unit determined that the gun matched the ballistics evidence obtained from the crime scene and the body of Crump. After seizing the gun, detectives obtained an arrest warrant for Appellant. Police arrested Appellant at his home at 6:00 a.m. on August 28, 2013.

Police took Appellant to the Homicide Unit at around 7:00 a.m. on August 28, 2013. At 11:39 a.m., Detective Griffin and Detective Freddy Mole gave Appellant his **Miranda**[4] warnings. At 11:45 a.m., Appellant began to give a second statement in which he admitted to killing Crump. He signed the statement at 1:40 p.m.

---

[4] **Miranda v. Arizona**, 384 U.S. 436 (1966).

As to the procedural history of this matter, on October 14, 2013, Appellant filed a motion to suppress both statements he made to police. In his motion to suppress, Appellant asserted that he was arrested prior to giving both statements and that he was not warned of, nor did he waive, his *Miranda* rights. *See* Ominbus Pretrial Mot., 10/14/13, at 2-3 (unpaginated).

Appellant testified at the suppression hearing that during the thirty-hour period in which he was initially at the Homicide Unit, he was not offered anything to eat or drink other than water. N.T. Suppression Hr'g, 10/8/14, at 32. Appellant was not able to sleep because

> [t]hey [kept] coming in interrogating me. Just they wouldn't allow me to sleep even if I wanted to. . . . I'll say they kept bombarding the room. Like, even if I started to get comfortable on the table, they would just like, get off the table, like. Like, they wouldn't allow me to get comfortable.

*Id.* at 33. Appellant had to be escorted any time he went to the bathroom. *Id.* Additionally, when asked if he was free to leave, Appellant stated: "Absolutely not. I wanted to leave, but they just said it doesn't work like that, kid." *Id.* Detective Griffin testified that Appellant "would have been given water, soda, a coffee, whatever beverage he chose that we had there as well as if he wanted a snack or a sandwich or something, we would have gotten it for him." N.T. Suppression Hr'g, 10/6/14, at 16. However, Detective Griffin also indicated that no requests were documented in the record and that he could not recall whether or not Appellant was provided with anything to eat or drink. *Id.*

While Appellant was at the Homicide Unit, his mother retained Appellant's trial counsel. Appellant's mother telephoned the Homicide Unit approximately twelve times in an attempt to ask Detective Griffin to inform Appellant that he had an attorney. Appellant's mother actually spoke with Detective Griffin on two occasions and informed him that Appellant was represented by counsel. Several days after Appellant was released, Appellant went to counsel's office, where counsel told him not to say anything to police without an attorney present.

In his second statement, after police arrested Appellant on August 28, 2013, Appellant confessed to the crime, admitting that he killed Crump because of a dispute over the division of the proceeds of a theft. At the suppression hearing, Detective Griffin testified that Appellant was merely informed he was under arrest, and that no informal conversation with Appellant occurred between 7:00 a.m., when Appellant was arrested, and 11:39 a.m., when Appellant was given his *Miranda* rights. *Id.* at 24. Detective Griffin stated that he read Appellant his *Miranda* warnings and that Appellant seemed to understand them and signed his name indicating that he understood the warnings. *Id.* at 26. The Commonwealth introduced a document into evidence with the *Miranda* warnings and Appellant's initials and signature that he understood the warnings. *See id.* at 23-27.

Appellant, however, testified that after he was arrested, he repeatedly told the detectives that his counsel informed him not to say anything without

counsel present. **See** N.T. Suppression Hr'g, 10/8/14, at 38. Appellant also testified that he did not sign any papers that day. **See id.**

The trial court denied Appellant's motion to suppress, making a credibility determination that Appellant "ha[d] to invoke his right to counsel personally. That was not done, in [the court's] opinion." N.T. Suppression Hr'g, 10/8/14, at 67.

Thereafter, Appellant proceeded to a jury trial. The trial court summarized the remaining procedural history of this appeal as follows:

> On October 15, 201[4], a jury found [Appellant] guilty of [the foregoing charges]. [Appellant] was immediately sentenced to life imprisonment for murder, three and one-half to seven years of imprisonment for [Section] 6106(a)(1) and two and one-half to five years of imprisonment for [PIC,] to run concurrently. On November 24, 2014, [Appellant] filed a *pro[ ]se* notice of appeal to the Superior Court. On March 2, 2015, the Superior Court quashed the appeal as untimely at No. 3463 EDA 2014.
>
> On September 9, 2015, [Appellant] filed a [*pro se*] PCRA[5] Petition. Eileen Hurley, Esquire [(PCRA counsel)] was appointed to represent [Appellant]. [On August 7, 2017, PCRA counsel filed an amended PCRA petition[6] requesting the restoration of Appellant's direct appeal rights *nunc pro tunc*.] On January 2, 2018, th[e trial c]ourt granted relief and restored [Appellant's] appellate rights. James F. Berardinelli, Esquire was appointed to represent [Appellant] on appeal. On February 1, 2018, [Appellant] by counsel filed a notice of appeal to the Superior Court.

Trial Ct. Op., 5/25/18, at 1-2.

---

[5] Post Conviction Relief Act, 42 Pa.C.S. §§ 9541-9546.

[6] The record does not reveal why it took nearly two years for the amended PCRA petition to be filed following Appellant's filing of his *pro se* PCRA petition.

Appellant filed a timely court-ordered Pa.R.A.P. 1925(b) statement after requesting and receiving an extension of time to do so. In his Rule 1925(b) statement, Appellant claimed that the trial court erred in denying his motion to suppress and that the mandatory imposition of a life sentence was unconstitutional under **Miller**. **See** Rule 1925(b) Statement, 4/20/18. The trial court issued a Pa.R.A.P. 1925(a) opinion suggesting no relief was due because: (1) Appellant was not in custody when he gave his first statement; (2) Appellant did not ask for a lawyer immediately before or while he gave his second statement; and (3) **Miller** did not apply because Appellant was nineteen years old when he committed the offenses. Trial Ct. Op., 5/25/18, at 5-6.

On appeal, Appellant raises the following questions for our review:

1. Did the [trial] court err in denying [Appellant's] Motion to Suppress his first statement where [Appellant] was not issued **Miranda** warnings and was held in custody for nearly 30 hours before the statement was obtained?

2. Did the [trial] court err in failing to suppress [Appellant's] second statement where [Appellant] had previously indicated his desire for counsel by retaining an attorney and meeting and consulting with him?

3. Is [Appellant's] sentence of life without parole a violation of the Eighth Amendment of the United States Constitution and Article 1, § 13 of the Pennsylvania Constitution under the rationale espoused by the Supreme Court of the United States in **Miller v. Alabama** . . . and its progeny?

Appellant's Brief at 3.

In his first issue, Appellant asserts that

after homicide detectives determined that they were[] "keeping" [Appellant] to verify the information initially provide by him[,] they detained him for nearly 30 hours [without food]. Such circumstances overwhelmingly establish the functional equivalent of an arrest, since no reasonable person would feel their freedom of movement and action [were] not restricted under such circumstances.

*Id.* at 10 (citing *Commonwealth v. Turner*, 772 A.2d 970 (Pa. Super. 2001)). Additionally, "[a]fter being subjected to these conditions, [Appellant] was not given *Miranda* warnings. As a result[,] his subsequent responses to questions should have been suppressed." *Id.*

We note that

our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

*Commonwealth v. Yandamuri*, 159 A.3d 503, 516 (Pa. 2017) (citations omitted).

It is well settled that

[i]n *Miranda,* the United States Supreme Court held that a confession given during custodial interrogation is presumptively involuntary, unless the accused is first advised of his right against self-incrimination. *Miranda* warnings are not required where the interrogation is not custodial. A person is in custody for the purposes of a custodial interrogation when he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of

- 8 -

action or movement is restricted by the interrogation. Police detentions become custodial when under the totality of the circumstances the conditions and/or duration of the detention become so coercive as to become the functional equivalent of arrest.

> Among the factors the court utilizes in determining, under the totality of the circumstances, whether the detention became so coercive as to constitute the functional equivalent of arrest are: the basis for the detention; the location; whether the suspect was transported against his will; how far, and why; whether restraints were used; the show, threat or use of force; and the methods of investigation used to confirm or dispel suspicions.

*Commonwealth v. DiStefano*, 782 A.2d 574, 579-80 (Pa. Super. 2001) (citations and internal quotation marks omitted).

In *Yandamuri*, the defendant asserted that his encounter with detectives that began at a casino was an illegal arrest unsupported by probable cause, and that all statements resulting from police questioning following the arrest should have been suppressed. *Id.* In support of his position, the defendant asserted that the detectives:

> had casino security personnel and a state policeman escort him from a gaming table to a private hallway restricted for casino employees; precluded him from cashing in his chips; failed to return his casino player's card; prohibited him from driving to the police station in his own vehicle; held his cell phone during the drive to the police station; and denied his requests to call his pregnant wife and answer her incoming call. [The defendant] argue[d] that a reasonable person under similar circumstances would not have felt comfortable terminating the encounter at the casino and, instead, would have complied with the detectives' request to accompany them to the police department solely out of fear. Accordingly, he contend[ed], all evidence stemming from the illegal detention at the casino, including his inculpatory written and video-taped statements given later at the police station, should have been suppressed.

- 9 -

*Id.* at 516-17.

The trial court in *Yandamuri* credited testimony from a detective, and found that

> two casino security officers and a Pennsylvania State Policeman made contact with Appellant at the blackjack table and asked him to come into the hallway; that [a detective] then asked [the defendant] if he would help in the investigation of Baby's kidnapping by coming to the police station to answer questions; that without hesitation, [the defendant] said yes; that none of the officers told [the defendant] that he was required to speak with them, none of them were in uniform, and no badges or weapons were displayed; that prior to exiting the casino, [the defendant] asked to cash out his chips, which a casino employee did for him; that the detectives informed [the defendant] that they would drive him to the police station and return him to his vehicle when the questioning was concluded; that [the defendant] was not restrained while travelling in [the detective's] unmarked vehicle; and that [the defendant] consented to [the detective] holding his cell phone during the ride and the phone was returned to him upon arriving at the police station without the detectives examining its contents. Based on the totality of these circumstances, the trial court concluded that [the defendant] was not under arrest or otherwise in custodial detention as a reasonable person in his circumstances would have felt free to decline the detectives' requests.

*Id.* at 517. Our Supreme Court held that the facts as determined by the trial court were supported by the record and that the legal conclusion that the defendant was not arrested or illegally detained was correct. *Id.*

In *DiStefano*, the trial court denied the defendant's suppression motion, holding that he was not subjected to a custodial interrogation where:

> 1) at one point during the interrogation, after the tone of the interview had turned accusatory and confrontational, one of the officers told [the defendant] that if he was not going to tell the truth, he might as well leave; 2) [the defendant] was twice told that he was not under arrest; 3) [the defendant] came to the

- 10 -

barracks voluntarily; 4) [the defendant] was not hand-cuffed or isolated in a holding area; 5) [the defendant] was given beverages and bathroom breaks; 6) the door to the interview room was closed but not locked; and 7) [the defendant] did not himself believe he was in custody because at one point he asked if he could leave.

*DiStefano*, 782 A.2d at 580.

However, this Court found that the trial court's determination was in error based upon the totality of the circumstances:

The subject interrogation was admittedly designed to elicit an incriminating response. The detention occurred in the police barracks. [The defendant] was detained for eleven hours overnight. The only persons [the defendant] saw during that time were police officers. The interview turned confrontational and accusatory five hours before its conclusion with the police telling [the defendant] that they believed he was the perpetrator and that they did not believe his denials. The crime under investigation was murder. [The defendant's] vehicle keys were taken from him and were not returned. At approximately 3:00 a.m., [the defendant] expressed a desire to leave and was told "no. You know, you're here. If you're going to tell us, tell us." Accordingly, we find that the police action physically and psychologically deprived [the defendant's] freedom of movement and choice in a significant way and constituted a custodial interrogation.

*Id.* Accordingly, this Court overruled the trial court's ruling on the suppression motion, finding that "the confession was given in violation of [the defendant's] rights under *Miranda* and was not voluntary." *Id.* at 584.

Here, the totality of the circumstances surrounding Appellant's initial interview with police at the Homicide Unit was more akin to the facts in *DiStefano* than the facts in *Yandamuri*. Appellant was detained for nearly thirty hours and only saw police officers during that time. Appellant was not permitted to go to the restroom alone and was provided only with water during

his detention. Appellant expressed a desire to leave but was told it "doesn't work like that." N.T. Suppression Hr'g, 10/8/14, at 33.

Accordingly, the trial court's determination that Appellant was not "in custody" is not supported by the record and is erroneous. *See Yandamuri*, 159 A.3d at 516. Rather, the police physically and psychologically deprived Appellant's freedom of movement and choice in a significant way, which constituted a custodial interrogation that was coercive and intimidating. *See DiStefano*, 782 A.2d at 580. As a result of the custodial interrogation to which Appellant was subjected during his first interview at the Homicide Unit, the written statement he made at the conclusion of the interview should have been suppressed. *See id.* at 584.

Nevertheless, we must address the Commonwealth's assertion that even if *Miranda* warnings were required during Appellant's initial interview, the introduction of Appellant's statements from that interview was harmless.

We note that "[a] suppression court's error regarding failure to suppress statements by the accused will not require reversal if the Commonwealth can establish beyond a reasonable doubt that the error was harmless." *Commonwealth v. Baez*, 720 A.2d 711, 720 (Pa. 1998).

Here, the contents of Appellant's exculpatory statement were similar to the contents of the statement of another witness, Ryan Farrell, which was introduced into evidence. Specifically, Farrell stated that the evening before Crump was killed, at some point after 10:00 p.m., Farrell saw Crump in front of Appellant's house. *See* Commonwealth's Ex. 50 at 2 (unpaginated). Crump

indicated he was going to Frankford, and walked away, which was the last time Farrell saw Crump. *Id.* Therefore, because the statements of Appellant and Farrell contained substantially similar information and Farrell's statement was properly introduced into evidence, the error in allowing Appellant's initial statement to be introduced into evidence was harmless beyond a reasonable doubt. *See Baez*, 720 A.2d at 720.

In his second issue, Appellant asserts that

[t]he Pennsylvania Supreme Court has recently addressed the remote invocation of the right to remain silent in *Commonwealth v. Bland*, 115 A.3d 854 (Pa. 201[5]). In *Bland*, the Court rejected [the] defendant's claim that a letter from counsel six days before his questioning constituted an invocation of his right to remain silent. Specifically, the Court stated that "[Bland] simply did not invoke his rights in close association with custodial interrogation; in point of fact, [Bland] acceded to questioning at such time." *Bland*, 115 A.[3]d at 862.

The instant case, however, stands in stark contrast to *Bland*. Here, [Appellant's] counsel immediately[] invoked [Appellant's] right to remain silent when [Appellant] was initially detained by police. Despite this invocation, the police subjected [Appellant] to questioning after he was detained on August 28, 2013. [Since Appellant had retained an attorney and met with the attorney, t]his questioning constituted a clear violation of [Appellant's] right to remain silent and right to counsel, the fruits of which must be suppressed.

Appellant's Brief at 10-11.

In *Bland*, the Pennsylvania Supreme Court rejected the defendant's attempt to anticipatorily invoke his right to counsel in advance of custodial interrogation. Rather, the Court held that "to require a suspension of questioning by law enforcement officials on pain of an exclusionary remedy,

- 13 -

an invocation of the ***Miranda***-based right to counsel must be made upon or after actual or imminent commencement of in-custody interrogation." ***Bland***, 115 A.3d at 863.

Instantly, Appellant asserts that his counsel invoked his right to counsel for him. Appellant's Brief at 10. This is contrary to the principle that "[a] defendant's right to counsel is the defendant's right and not the attorney's right." ***Commonwealth v. Lowery***, 419 A.2d 604, 607 (Pa. Super. 1980).

Moreover, Appellant attempts to distinguish ***Bland*** on the grounds that he allegedly invoked his right to counsel when the police questioned him following his arrest on August 28, 2013. However, at the suppression hearing, the trial court made a credibility determination that Appellant had not done so. ***See*** N.T. Suppression Hr'g, 10/8/14, at 67. The record reveals only that Appellant spoke with counsel several days before his arrest. Assuming the meeting with counsel is the basis for Appellant's assertion of his right to counsel, it was not "upon or after actual or imminent commencement of in-custody interrogation." ***Bland***, 115 A.3d at 863. Accordingly, no relief is due. ***See id.***

In his final issue, Appellant argues that his sentence of life without parole is "a violation of the Eighth Amendment of the United States Constitution and Article 1, § 13 of the Pennsylvania Constitution under the rationale espoused by the Supreme Court of the United States in ***Miller v. Alabama***[.]" Appellant's Brief at 12. Appellant asserts that this is the case because "[r]ecent science . . . has determined that the immaturity,

- 14 -

impetuosity and failure to appreciate risks and consequences on which ***Miller's*** holding is rooted, continue into [a person's] mid-20's[.]" ***Id.***

The holding in ***Miller*** applies to juveniles under the age of eighteen. Appellant provides no case, and we are unaware of any, which extends its holding to individuals over the age of eighteen at the time they committed murder. Because Appellant was nineteen at the time of the crime in the instant matter, he cannot avail himself of the holding in ***Miller***. ***See, e.g.***, ***Commonwealth v. Furgess***, 149 A.3d 90, 94 (Pa. Super. 2016) (holding that "petitioners who were older than 18 at the time they committed murder are not within the ambit of the ***Miller*** decision").

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/19/19