**[J-15-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 801 CAP |
| | : | |
| Appellee | : | Appeal from the Judgment of |
| | : | Sentence entered on May 31, 2022, |
| | : | in the Court of Common Pleas of |
| v. | : | Cumberland County, Criminal |
| | : | Division, at No. CP-21-CR-0001964- |
| | : | 2020. |
| DAVONE UNIQUE ANDERSON, | : | |
| | : | ARGUED:  March 6, 2024 |
| Appellant | : | |


**OPINION**


**CHIEF JUSTICE TODD**                    **DECIDED: September 26, 2024**

In this direct capital appeal,[1]  Appellant Davone Unique Anderson challenges the sentence of death imposed by the Cumberland County Court of Common Pleas following his conviction by a jury of two counts of first-degree murder,[2] one count of first-degree murder of an unborn child,[3] and two counts of endangering the welfare of children.[4]  For the reasons that follow, we affirm Appellant's judgment of sentence.

The following evidence was presented at trial.  On July 5, 2020, at approximately 4:00 p.m., Sergeant Joshua Bucher of the Carlisle Police Department was dispatched to an apartment at 137 East Louther Street, in Carlisle, Pennsylvania.  When he arrived, the

---

[1] *See* 42 Pa.C.S. § 9546(d) (a final court order in a case in which the death penalty has been imposed shall be directly appealable to the Supreme Court); *id.* § 9711(h)(1) (sentence of death shall be subject to automatic review by Supreme Court).
[2] 18 Pa.C.S. § 2502.
[3] *Id.* § 2604(a)(1).
[4] *Id.* § 4304(a)(1).

door to the apartment was ajar, and he called out and pushed the door open. Sergeant Bucher observed a woman, Sydney Parmalee, laying face-up across a sofa and ottoman, with a gunshot wound to her head and a pistol near her outstretched hand. Sergeant Bucher called for back-up, and, after the apartment had been cleared, Sergeant Bucher saw Appellant and his mother in the hallway outside of the apartment.

At Sergeant Bucher's request, Corporal Scott Hertzler, another responding officer, spoke with Appellant. Appellant told Corporal Hertzler that he was the father of Sydney's two children, and that Sydney did not live at the apartment; rather, Kaylee Lyons lived in the apartment with her 13-month-old son, Royce, of whom Appellant also was the father. Appellant stated that he and Sydney had been arguing inside the apartment, and he stepped outside the back door to smoke a cigarette, whereupon he heard what he believed was a gunshot. When he went back inside the apartment, he found Sydney dead, and Royce sitting on the sofa near her. Appellant took Royce and went to his mother's house, which was approximately two blocks away. There, Appellant told her that Sydney had just committed suicide. Appellant's mother called 911.

Notably, Appellant's version of the events was belied by the evidence, including the fact that the back door to the outside of the apartment was locked from the inside with a deadbolt, and the alternate exit to the outside was blocked by a fan. Further, an autopsy revealed that Sydney died from a single gunshot wound to the head, the shot having been fired from at least three feet away. Based on the distance and downward angle at which the gun was fired, Sydney's death ultimately was ruled a homicide, not a suicide.

Almost immediately after Sydney's death, and before the investigation into Sydney's death was complete, Appellant began residing with Kaylee and Royce in Kaylee's apartment. On July 30, 2020, less than one month following the murder of Sydney, Appellant arrived at his mother's house where his cousin, Allison Murray, also

was present. Appellant told the women, "somebody needs to go get Royce," N.T., 5/4/22, at 109, and then left without explanation. Appellant's mother and Murray drove to the apartment, and Murray went inside to look for Royce. She found him in a back bedroom, and took him outside to his grandmother. Murray reentered the apartment and found Kaylee lying on the floor in the fetal position under a table in the living room with a head wound. Murray called 911, and Officer Ronald Hoover was the first officer to arrive at the scene. After escorting Murray from the room, Officer Hoover attempted to perform CPR on Kaylee until paramedics arrived, to no avail. Kaylee was pronounced dead, and an autopsy revealed that she died from a gunshot wound to her head, and that the shot had been fired from three to four feet away. The autopsy also confirmed that Kaylee was pregnant with Appellant's child at the time of her death.[5] During their investigation of Kaylee's apartment, the police observed a bullet on the living room sofa that appeared to have plaster on it, suggesting it had ricocheted off the wall and ceiling.

On the same day Kaylee was found dead in her apartment, Appellant arrived unexpectedly at his friend Jasmyn Lloyd's house in Harrisburg. According to Lloyd, although Appellant often visited her, he usually called first. Lloyd observed that Appellant seemed jittery, not as talkative as usual, and "just off." N.T., 5/5/22, at 54. Appellant asked Lloyd if anyone had contacted her, stating "they were coming," and he then asked for a change of clothing and some bleach. *Id.* at 55. As Appellant left Lloyd's house, he

---

[5] Kaylee's mother testified that she was at Kaylee's home five days before Kaylee's death, and saw a dry-erase board on the refrigerator that listed the names of all of Appellant's children; the last name on the list was "Davone Junior." When she questioned her daughter about the name, Kaylee and Appellant admitted they were expecting a child. *See* N.T., 5/4/22, at 99-103.

asked her for a rag and some bullets; she gave him a rag, but not bullets, and saw him wrap a gun in the rag.[6]

At approximately 4:00 a.m. on July 31, 2020, several hours after leaving Lloyd's house, Appellant was arrested in Carlisle, Pennsylvania, on, *inter alia*, charges of receiving stolen property and unauthorized use of firearms. He was in possession of Kaylee's car. Appellant immediately invoked his right to counsel and was taken to the Cumberland County Prison for booking. Shortly before 3:00 p.m. that same day, then-Corporal, now-Sergeant Jason Sweeney, who was preparing to begin his shift, observed that Appellant, who was still in a holding cell awaiting booking, was "crying a little bit," and "seemed out of sorts." N.T., 12/27/21, at 27. Sergeant Sweeney went into Appellant's cell to speak with him, and Appellant indicated that he had not slept for several days, and had taken a lot of drugs, including ecstasy and marijuana. *Id.* at 29. When Appellant asked if he could make a call, Sergeant Sweeney told him he could not make a call until he was processed. *Id.* Appellant then asked Sergeant Sweeney to have detectives come in so he could speak with them; however, Sergeant Sweeney did not convey the request. *Id.* at 31.

Shortly after beginning his 3:00 p.m. shift at the prison on July 31, 2020, Officer Matthew Corsiglia observed Appellant, who was still in his holding cell, attempting to tie elastic from a face mask around his neck. Due to concerns that he was suicidal, Appellant was placed in a medical holding cell in a suicide smock. Sometime between 6:45 p.m. and 7:00 p.m., Appellant knocked on the glass window of the holding cell to get the attention of Officer Corsiglia. When the officer approached Appellant's cell, Appellant stated that he wanted to confess something. Officer Corsiglia immediately went to his

---

[6] Eight months later, Lloyd's neighbor found a gun wrapped in a rag in a pile of leaves under his car, which he had not used for a long time. He called the police, and the rag was identified as that which Lloyd had given Appellant months earlier. A firearms expert confirmed that the gun was the same one used to kill Kaylee.

desk to contact Detectives Thomas Dolan and Christopher Miller, who were investigating the murder of Sydney. Appellant again summoned Officer Corsiglia over to his cell window and stated, "I killed them both." *Id.* at 15. Officer Corsiglia asked him to repeat his statement, and Appellant again stated that he "killed them both," and mentioned two names, although Officer Corsiglia could not recall what the names were at the time of his testimony. *Id.*

Detectives Dolan and Miller arrived at the prison shortly after 7:00 p.m., and Officer Corsiglia relayed what Appellant had said to him. Appellant was taken to an interview room, where the detectives began questioning him. After several minutes, Appellant requested a lawyer, but the detectives ignored his request and continued to question him. *Id.* at 67. Eventually, Appellant was read his *Miranda*[7] rights, and he indicated that he was willing to speak with the detectives. During the interrogation, Appellant exhibited signs of paranoia and expressed fear that the prison guards were trying to kill him and that they would place him in his cell and set him on fire. *Id.* After approximately 40 minutes of conversation (the "First Interview"), Appellant repeated his request for an attorney, and refused to answer any additional questions. Detectives Dolan and Miller ceased the interrogation and left the room.

Thereafter, Appellant asked one of the booking officers if he could speak with Sergeant Sweeney again, and he asked Sergeant Sweeney if he could call his mother. Sergeant Sweeney advised Appellant that he was not permitted to make a call until he was charged and processed. Appellant then requested that Detectives Dolan and Miller return to the room. At approximately 8:20 p.m., Detectives Dolan and Miller re-read Appellant his *Miranda* rights, and resumed questioning him (the "Second Interview"). Appellant continued to express concern that the prison guards were going to put him in a

---

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

cell and set him on fire. *Id.* at 73. This interrogation lasted for approximately 50 minutes and ended when Appellant refused to answer additional questions.

At approximately 9:42 p.m., the detectives decided to execute search warrants on Appellant to test for gunshot residue and DNA. During the execution of these warrants, which they had in their possession when they first arrived at the prison earlier in the day, Appellant made an unsolicited statement that he killed Sydney and Kaylee. Specifically, according to Detective Dolan, Appellant stated: "I killed Sydney. I killed Kaylee too." N.T., 5/6/22, at 17.

On the following day, August 1, 2020, Detectives Dolan and Miller retrieved Appellant from the prison, telling him they would take him for a ride in their vehicle so that he could get some fresh air. In truth, the detectives wanted to find the gun Appellant had used to kill Kaylee, and the detectives had equipped their vehicle with a recording device so they could secretly record any statements made by Appellant. According to Detective Dolan, Appellant feared the detectives "were taking him out to kill him," N.T., 12/27/21, at 80, asked to be returned to the prison, and re-invoked his *Miranda* rights.

On August 10, 2020, Appellant was formally charged with, *inter alia*, the murders of Sydney, Kaylee, and Kaylee's unborn child. Prior to trial, Appellant sought to suppress all of his statements admitting that he killed Sydney and Kaylee. Following a suppression hearing, the trial court concluded that the statements Appellant made to Officer Corsiglia, and those he made to Detectives Dolan and Miller at the beginning of their execution of the search warrants, were voluntary statements that were not made in response to any police questioning and, thus, were admissible at trial. The trial court determined, however, that all of the other statements made by Appellant − including those made during the First Interview, the Second Interview, and those made following the execution of the warrant and in the police car on August 1, 2020 − were obtained in violation of

Appellant's Fifth and Sixth Amendment rights. Accordingly, the trial court suppressed those statements.

In addition to the unsuppressed statements described above, the Commonwealth presented at trial the testimony of Kaylee's upstairs neighbor, Haley Eschelman, who stated that she heard Kaylee repeatedly shouting at Appellant, "you killed her," the evening before Kaylee's body was found. N.T., 5/4/22, at 60.

At the close of the Commonwealth's case-in-chief, Appellant admitted, through counsel, that he killed both Sydney and Kaylee. In addition to first-degree murder, the trial court, pursuant to Appellant's request, charged the jury on the offense of voluntary manslaughter. As noted above, the jury convicted Appellant of two counts of first-degree murder for the murders of Sydney and Kaylee, the first-degree murder of Kaylee's unborn child, and two counts of endangering the welfare of children.

At the penalty phase of Appellant's trial, the Commonwealth introduced the evidence from the guilt-phase proceedings. It also presented victim impact testimony from the families of the victims, including Sydney's mother and sister, and Kaylee's mother and father.

Appellant sought to establish mitigating factors by presenting the testimony of Louise Luck, a mitigation expert, who testified extensively regarding Appellant's family history, which involved physical, emotional, and sexual abuse; criminality; and neglect. She recounted how, after high school, Appellant enlisted in the army, where he was abused by a fellow service member and ultimately discharged for his ongoing use of marijuana. She noted that, after leaving the military, Appellant's goal was to start a clothing company and that he took steps to do so. He also attempted to become physically healthy, and tried to be a role model for his brothers, moving his mother and brothers from Georgia to Carlisle to live with him and Sydney. However, Luck testified

that, in light of his past trauma, the presence of Appellant's mother had a negative impact on him, and he became depressed and resumed using drugs.

In connection with the murder of Kaylee, the Commonwealth proposed a First Degree Murder Sentencing Verdict Slip ("Sentencing Verdict Slip"), listing the following aggravating circumstances:

> (1) The defendant committed a killing while in the perpetration of a felony.
>
> (2) The defendant has a significant history of felony convictions involving the use or threat of violence to the person.
>
> (3) The defendant has been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense.

Sentencing Verdict Slip at 1. The Sentencing Verdict Slip was agreed to by the parties.

The jury deadlocked regarding the appropriate sentence for the murder of Sydney, and the trial court therefore imposed a sentence of life imprisonment without the possibility of parole. The trial court also imposed a sentence of life imprisonment for the homicide of Kaylee's unborn child. With respect to Kaylee's murder, the jury found one aggravating circumstance under 42 Pa.C.S. § 9711(d)(10) – that Appellant had been convicted of another federal or state offense (Sydney's murder) for which a sentence of life imprisonment or death was imposable. The jury also found one mitigating circumstance − the "catch-all" mitigator under 42 Pa.C.S. § 9711(e)(8). The jury concluded, however, that the aggravating circumstance outweighed the sole mitigating factor, and recommended a sentence of death. Thus, in accordance with 42 Pa.C.S. § 9711(c)(1)(iv) (requiring a death sentence if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances), on May 31,

2022, the trial court imposed a sentence of death. Appellant's subsequent post-sentence motion was denied, and he filed a direct appeal in this Court.[8]

## I. Sufficiency of the Evidence

### A. Homicide

We begin by addressing Appellant's contention that the evidence was insufficient to support his convictions for the first-degree murders of Sydney and Kaylee.[9] [10] Appellant does not dispute that he shot and killed Sydney and Kaylee. However, he submits that the jury "should have found" him guilty of voluntary manslaughter, rather than first-degree murder, because the evidence established that, prior to each murder, "arguments, screaming or a verbal fight was heard," thus demonstrating that the murders "occur[ed] in the heat of passion." Appellant's Brief at 20. Appellant further maintains: "The facts presented to the jury show no premeditation, in fact the mutually shared circumstances of both homicides belie logic of premeditation – that a man would murder two separate women, in the same room, in the same month, in the same method, clearly shows a lack of planning." *Id.*

The Commonwealth asserts that it established each of the necessary prongs to prove that Appellant committed first-degree murder when he killed Sydney and Kaylee,

---

[8] We have reordered Appellant's arguments.

[9] Although Appellant raises a challenge to the sufficiency of the evidence, we note that, in all direct capital appeals, this Court performs a self-imposed duty to review the sufficiency of the evidence in support of a first-degree murder verdict resulting in a death sentence. *See Commonwealth v. Le*, 208 A.3d 960, 969 (Pa. 2019). Moreover, we review the sufficiency of the evidence notwithstanding the fact that, in challenging the weight of the evidence, Appellant concedes that the evidence is sufficient to support his convictions for first-degree murder. *See Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000) (providing that "[a] motion for [a] new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict.").

[10] Appellant does not challenge the sufficiency of the evidence supporting his conviction for the murder of an unborn child.

including that a human being was killed; the accused caused the death; and the accused acted with malice and the specific intent to kill. With respect to Appellant's suggestion that the similarities between the two murders undercut the notion that the murders were premeditated, the Commonwealth takes the opposite position, comparing the instant case to *Commonwealth v. Boczowski*, 846 A.2d 75 (Pa. 2004) (evidence that appellant's deceased wives, both of whom were in their thirties and in good health, were found to have been strangled, despite appellant's claim that they had drowned after consuming alcohol, and appellant's admission that he argued with both women prior to their deaths and had fresh scratch marks on his arms, hands, and torso on both occasions, was sufficient to support the jury's finding that the second killing was premediated).

In reviewing a challenge to the sufficiency of the evidence, we must determine whether the evidence admitted at trial, and all the reasonable inferences derived therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, supports the jury's finding of all of the elements of the offense beyond a reasonable doubt. *Le*, 208 A.3d at 969.

First-degree murder is an intentional killing. 18 Pa.C.S. § 2502(a). An intentional killing is a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." *Id.* § 2502(d). In order to prove first-degree murder, the Commonwealth must establish that: (1) a human being was killed; (2) the accused caused the death; and (3) the accused acted with malice and the specific intent to kill. *Le*, 208 A.3d at 969. A jury may infer the specific intent to kill based upon the defendant's use of a deadly weapon on a vital part of the victim's body. *Id.*

Furthermore, the law does not require a lengthy period of premeditation. Indeed, "the period of reflection required for premeditation to establish the specific intent to kill . . . can be formulated in a fraction of a second. Premeditation and deliberation exist

whenever the assailant possesses the conscious purpose to bring about death."
*Commonwealth v. Rivera*, 983 A.2d 1211, 1220 (Pa. 2009).

Voluntary manslaughter is defined as follows:

> (a) General rule.—A person who kills an individual without lawful
> justification commits voluntary manslaughter if at the time of
> the killing he is acting under a sudden and intense passion
> resulting from serious provocation by:
>
> (1) the individual killed[.]

18 Pa.C.S. § 2503(a)(1). In this regard, the test for determining whether there was adequate provocation is whether a reasonable man, confronted with a particular series of events, "became impassioned to the extent that his mind was incapable of cool reflection." *Commonwealth v. Montalvo*, 986 A.2d 84, 100 (Pa. 2009) (citation omitted).

We reject Appellant's argument that the evidence does not support his convictions for first-degree murder, but, rather, at most supports a conviction for voluntary manslaughter. It is undisputed that both Sydney and Kaylee were killed by gunshots to the head. Further, Appellant admitted that he fired the shots that caused their deaths. Thus, the first two requirements for verdicts of first-degree murder − a human being was killed and the accused caused the death − were established.

Appellant maintains there was insufficient evidence to establish the third requirement − that he acted with malice and the specific intent to kill − because the evidence demonstrated that the murders occurred in the heat of passion, and, thus, were not premeditated. However, with respect to Kaylee's murder, the only evidence Appellant offers to support his claim is the trial testimony of Kaylee's upstairs neighbor, Haley Eschelman, who stated that she heard Kaylee repeatedly shouting at Appellant, "you killed her," the evening before Kaylee's body was found. N.T., 5/4/22, at 60. Moreover, Appellant fails to identify any evidence, aside from his own self-serving statement to police that he and Sydney had been arguing before he went outside to smoke a cigarette

and then returned to find Sydney dead of a gunshot wound, to support his assertion that he and Sydney had been involved in an argument or fight immediately prior to her murder, and, thus, that he acted under a sudden and intense passion resulting from serious provocation.

As described above, the evidence established that both Sydney and Kaylee were shot in the head, a vital part of their bodies, by Appellant from a distance of approximately three to four feet away. Notwithstanding the trial court's jury instruction on voluntary manslaughter, the evidence that Appellant used a deadly weapon on a vital part of the victims' bodies was sufficient to allow the jury to infer that Appellant acted with malice and the specific intent to kill. *See Le*, 208 A.3d at 969. Accordingly, as the evidence demonstrated that: (1) Sydney and Kaylee were killed by gunshots to the head, a vital part of their bodies; (2) Appellant fired the shots that caused their deaths; and (3) Appellant acted with malice and the specific intent to kill, the evidence was sufficient to support Appellant's convictions for first-degree murder in the deaths of Sydney and Kaylee.

### B. Endangering the Welfare of a Child

As noted above, Appellant was convicted of two separate counts of endangering the welfare of a child under 18 Pa.C.S. § 4304 − one based on his actions on July 5, 2020, when he fatally shot Sydney as his son sat near her on the sofa, and one based on his actions on July 30, 2020, when he fatally shot Kaylee and then left his son alone with her in the apartment. Before this Court, Appellant challenges only the sufficiency of the evidence in support of his conviction with respect to the July 30, 2020 incident. With respect to that incident, Appellant maintains that "[t]he mere presence of a child in the home during a murder, where the victim is shot by a single round, is facially insufficient to support a verdict of Endangering the Welfare of Children." Appellant's Brief at 30.

The Commonwealth, conversely, argues that the evidence that the bullet that killed Kaylee had ricocheted through the living room, and that Appellant left Royce alone at home after Kaylee had been shot and lay helpless on the floor, was sufficient to demonstrate that Appellant failed to protect Royce's physical, psychological, and moral well-being. Commonwealth's Brief at 49.

Section 4304 of the Crimes Code provides that, "[a] parent, guardian or other person supervising the welfare of a child under 18 years of age . . . commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S. § 4304(a)(1). In this regard, a person acts knowingly with respect to a material element of an offense:

> (i)     if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and
>
> (ii)    if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

*Id.* § 302(b)(2).

We conclude that the evidence was sufficient to support Appellant's conviction for endangering the welfare of a child under Section 4304. Not only did Appellant fire a loaded gun at Kaylee's head while Royce was in the apartment, Appellant then left Royce, who was only 13 months old, alone in the apartment, in his crib, with no supervision. Further, Appellant clearly was aware of the danger of leaving Royce alone without care or supervision, as evidenced by the fact that, upon arriving at his mother's home after shooting Kaylee, he told his mother and cousin that, "somebody needs to go get Royce." N.T., 5/4/22, at 109. As the evidence demonstrates that Appellant fatally shot Kaylee in the head while Royce was in the apartment, and then left Royce alone in the apartment with her, with an awareness of the danger of doing so, the evidence was sufficient to

establish that, on July 30, 2020, he knowingly endangered the welfare of Royce by violating his duty to protect him.

## II. Admission of Appellant's "Excited Utterance"

Appellant next challenges the trial court's denial of his pretrial motion to suppress his "excited utterance," wherein he confessed to killing Sydney and Kaylee in the presence of Detectives Dolan and Miller as they executed the warrant for his DNA and gunshot residue. Appellant's Brief at 28. Specifically, Appellant contends that the police, in violation of *Miranda*, "repeatedly refused to scrupulously honor his unambiguous invocation of his state and federal constitutional rights to remain silent and to the assistance of counsel" by resuming questioning of Appellant "on their own initiative." *Id.*

In denying Appellant's motion to suppress this statement, the trial court determined it was a "voluntary statement[] and not made in response to any questioning." Trial Court Findings of Fact and Conclusions of Law, 12/27/21, at 4.

When reviewing the denial of a suppression motion, this Court reviews only the suppression hearing record, and not the evidence elicited at trial. *Commonwealth v. Frein*, 206 A.3d 1049, 1064 (Pa. 2019). Where the record supports the suppression court's factual findings, we are bound by those findings and may reverse only if the court's legal conclusions are erroneous. *Id.*

As the basis for his claim that the trial court erred in denying his motion to suppress the statement at issue, Appellant asserts:

> the police in Appellant's case, while he was undergoing custodial interrogation, repeatedly refused to scrupulously honor his unambiguous invocation of his state and federal constitutional rights to remain silent and to the assistance of counsel and, instead, on multiple occasions resumed questioning Appellant on their own initiative; hence, all incriminating statements must be suppressed and excluded from trial.

> Although previously raised and preserved for appeal, the admission of the statements made to law enforcement and played in the Courtroom via both audio and video for the jury at trial, was the crux of the Commonwealth's case in chief and the resulting murder convictions that rest upon such evidence are the exact kind of prejudicial violations our Constitutions seek to exclude from cases.

Appellant's Brief at 28-29.

The Commonwealth responds by noting that an "excited utterance," defined as a statement relating to a startling event or condition made while the declarant was under the stress or excitement caused by an event, is an exception to the hearsay rule. Commonwealth's Brief at 46 (citing *Commonwealth v. Stallworth*, 781 A.2d 110, 119-20 (Pa. 2001)). The Commonwealth further avers that excited utterances are not precluded by *Miranda*. *Id.* (citing *Commonwealth v. Johnson*, 42 A.3d 1017, 1029 (Pa. 2012)). Thus, the Commonwealth argues that Appellant's "excited utterance," which was "made voluntarily and without any prompt from law enforcement," was properly admitted at trial. *Id.* at 47.

Initially, we observe that Appellant's characterization of his statement that he killed Sydney and Kaylee, made in the presence of the detectives as they prepared to execute a search warrant for gunshot residue and DNA, as an "excited utterance" is somewhat inaccurate. As noted by the Commonwealth, the term "excited utterance" generally is used to refer to a statement made by an individual who was under stress or excitement caused by a particular event, and which a party seeks to admit into evidence as a hearsay exception. *See Commonwealth v. Carpenter*, 725 A.2d 154, 165 (Pa. 1999) (an excited utterance is an exception to the evidentiary rule prohibiting the admission of hearsay). However, Appellant does not challenge his statement as hearsay; he contends it should have been suppressed under *Miranda*.

The statement which Appellant argues should not have been admitted into evidence by the trial court is more properly characterized as a "*spontaneous* utterance,"

but, as we explained in *Johnson*, "*Miranda* does not preclude the admission of spontaneous utterances." 42 A.3d at 1029; *see also Commonwealth v. Baez*, 720 A.2d 711, 720 (Pa. 1998) ("[V]olunteered or spontaneous utterances are admissible even though the declarant was not 'Mirandized.'").

In his *Miranda*-based argument, Appellant does not reference or cite to the transcript of the suppression hearing, nor does he address the trial court's findings of fact or legal conclusions regarding its decision to admit Appellant's "excited utterance," while, at the same time, suppressing numerous other statements it found to have been obtained in violation of Appellant's Fifth and Sixth Amendment rights. Regardless, our independent review of the record supports the trial court's finding that Appellant's statement was made voluntarily, and not in response to any prompting by law enforcement. Accordingly, we conclude that the trial court did not err in refusing to suppress Appellant's spontaneous statement, made in the presence of the detectives, that he killed Sydney and Kaylee.

### III. Weight of the Evidence

Appellant next contends that the verdicts were against the weight of the evidence. A verdict is against the weight of the evidence "only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice." *Commonwealth v. VanDivner,* 962 A.2d 1170, 1177 (Pa. 2009) (citation omitted). It is well established that a weight of the evidence claim is addressed to the discretion of the trial court, and "[a] new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Widmer,* 744 A.2d at 751-52. Rather, the role of the trial court is to determine whether, notwithstanding all the evidence, certain facts are so clearly of greater weight that to ignore them, or to give them equal weight with all the facts, is to deny justice. *Id.* at 752.

In reviewing a challenge to the weight of the evidence, the function of an appellate court is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider *de novo* the underlying question of the weight of the evidence. *VanDivner,* 962 A.2d at 1178. Appellate review "is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose [an] abuse of discretion." *Commonwealth v. Diggs,* 949 A.2d 873, 879 (Pa. 2008).

In rejecting Appellant's post-sentence challenge to the weight of the evidence, the trial court recognized that the weight of the evidence is exclusively for the finder of fact:

> Before we can overturn a verdict based on [a weight of the evidence] challenge, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court. . . . We cannot say, based on the evidence recited above, that it was tenuous, vague, or uncertain. Our conscience was certainly not shocked by any of the jury's verdicts.

Trial Court Opinion, 4/12/23, at 21. After recounting all of the evidence presented at trial, the court concluded that the "evidence was not only sufficient, but it was overwhelming." *Id.* at 20.

In support of his argument that the verdicts were, in fact, against the weight of the evidence, Appellant highlights that there were no eyewitnesses to the shooting of Sydney or Kaylee; no fingerprints found on the firearms that caused their deaths; and no gunshot residue found on him. Appellant thus contends that the Commonwealth's case "depended upon the admission of an excited utterance made to law enforcement while preparing to take a buccal swab . . . just minutes after he had exercised his right to counsel." Appellant's Brief at 21. Appellant submits that "[t]he entire weight of the evidence hinges on this voluntariness of the admission," and "the voluntariness of the

same should [lead] the trier of fact to find that the verdict was against the weight of the evidence." *Id.*

In response, the Commonwealth recounts that the evidence established that: Appellant was the only adult with each victim immediately prior to their deaths; Appellant attempted to portray Sydney's death as a suicide, which was contrary to the physical evidence; and Kaylee's upstairs neighbor reported hearing Kaylee, the evening before she was found dead, screaming at Appellant that he had killed Sydney. The Commonwealth further notes that the evidence demonstrated that Appellant fled the apartment where Kaylee was murdered, and people who observed him afterward noted he was acting strangely; Appellant's friend, Jasmyn Lloyd, indicated that, on the day Kaylee was murdered, Appellant appeared unannounced at her home and asked for bleach, new clothing, and a rag, and Lloyd observed Appellant wrap a firearm in the rag; the firearm that was used to kill Kaylee was subsequently found wrapped in the rag Lloyd provided under Lloyd's neighbor's car; and, during the execution of a search warrant of his person, Appellant made an unsolicited statement that he killed both Sydney and Kaylee. Commonwealth's Brief at 43-44.

We cannot conclude, based on the evidence detailed above, that the trial court abused its discretion in denying Appellant a new trial based on his claim that the verdicts were against the weight of the evidence. Notwithstanding Appellant's argument to the contrary, the Commonwealth's case did not rise and fall on the admission of Appellant's spontaneous utterance that he killed Sydney and Kaylee, which he made in the presence of the detectives as they were preparing to take a buccal swab. Indeed, there was substantial evidence, as detailed above, that supported the jury's verdicts. Moreover, Appellant fails to acknowledge that, at the end of the Commonwealth's presentation of its case-in-chief, Appellant admitted, through counsel, that he killed both Sydney and Kaylee.

To the extent Appellant's challenge to the weight of the evidence is based on his contention that the jury should have convicted him of voluntary manslaughter instead of first-degree murder because he allegedly shot both victims while acting under a sudden and intense passion resulting from serious provocation, we reiterate, as discussed above, that the evidence that Appellant used a deadly weapon on a vital part of the victims' bodies was sufficient to allow the jury to infer that Appellant acted with malice and the specific intent to kill, as required for a conviction for first-degree murder.

The jury was instructed on the elements of both first-degree murder and voluntary manslaughter, and determined that Appellant was guilty of first-degree murder, specifically rejecting a verdict of voluntary manslaughter. Notwithstanding the brevity of the trial court's analysis, it explained that, based on the evidence presented at trial, the jury's verdicts did not shock its conscience. We find no abuse of discretion by the trial court in this regard.

## IV. Review of Death Sentence

Appellant next challenges the jury's recommendation of a sentence of death for the murder of Kaylee. We would review Appellant's death sentence even if he had not raised it, as we are statutorily required, in all cases in which the death penalty is imposed, to conduct an independent review to determine: (1) whether the sentence of death was the product of passion, prejudice, or any other arbitrary factor; or (2) if the evidence fails to support the finding of at least one aggravating circumstance under 42 Pa.C.S. § 9711(d). *See id.* § 9711(h)(3) (requiring affirmance of the sentence of death unless this Court concludes either of these two factors are present).

That said, Appellant specifically maintains that the jury improperly recommended a sentence of death for Kaylee's murder by erroneously considering the death of Sydney as an aggravating factor. As noted above, after the jury convicted Appellant of the

murders of Sydney, Kaylee, and Kaylee's unborn child, the trial court provided the jury

with a Sentencing Verdict Slip for Kaylee. The Sentencing Verdict Slip provided, *inter

alia*, the following aggravating circumstance for the jury's consideration pursuant to 42

Pa.C.S. § 9711(d)(10):

> The defendant has been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense.

Sentencing Verdict Slip, I(B)1(3).

Section II of the Sentencing Verdict Slip is reproduced below:

## II. SENTENCING VERDICT AND FINDINGS

If you have reached a unanimous verdict, complete this part of the form.

In Section A, indicate whether the sentencing verdict is death or life imprisonment. If the sentence is death, indicate the basis for that verdict by completing Section B. If the sentence is life imprisonment, indicate the basis for that verdict by completing Section C.

A. We, the jury, unanimously sentence the defendant to (check one):

__✓__ Death

____ Life Imprisonment

B. The findings on which the sentence of death is based are (check one):

____ 1. At least one aggravating circumstance and no mitigating circumstance. The aggravating circumstance(s) unanimously found (is) (are): .....................................................................................

__✓__ 2. One or more aggravating circumstances which outweigh(s) any mitigating circumstance(s).

The aggravating circumstance(s) unanimously found (is) (are): _Sydney_ ~~B(3)~~ _B.1.(3)_

The mitigating circumstance(s) found by one or more of us (is) (are): _B.2.(2)_

Appellant argues that:

> [t]he focus on the name Sydney [Parmalee] – who the jury found was previously murdered by Davone Anderson, shows that the verdict of death in the case of Kaylee Lyons was based on sympathy for the loss of Sydney or additionally based on the actual death or killing of Sydney, which is not an

aggravating factor and could not be considered by the jury in their penalty deliberations.

Appellant's Brief at 17-18.

The Commonwealth responds, *inter alia*, by noting that Section 9711(d)(10) specifically allows the jury to consider whether a defendant has been convicted of another offense punishable by death either before or at the time of the offense at issue in finding the existence of an aggravating circumstance. It further emphasizes that the weighing of aggravating and mitigating factors is solely for the jury, and avers that there is no evidence in the instant case that the jury's recommended sentence of death was the product of passion, prejudice, or some other arbitrary factor.

We conclude that Appellant's argument is without merit. To the degree that Appellant contends that Sydney's death was not a proper aggravating factor for the jury to consider, the law specifically allows a jury to consider, as an aggravating factor, the fact that a defendant has been convicted of another offense punishable by death either before or at the time of the offense for which he is being sentenced. 42 Pa.C.S. § 9711(d)(10). In this case, that prior offense was the first-degree murder of Sydney.

With regard to Appellant's suggestion that the jury's initial writing of the name "Sydney" on the line for the aggravator demonstrated that the jury's verdict was a result of passion, we agree with the trial court's response to Appellant's argument:

> We see it as a logical description of the supporting fact for the aggravating factor as Sydney Parmelee's murder constituted a triggering circumstance under Section 9711(d)(10), which was listed as B.1.(3) on the verdict slip. The fact that "Sydney" and the incorrect citation of "B(3)" were both crossed out to write-in the correct citation of B.1.(3) also suggests that it was a matter of not being sure how to cite the aggravating factor on the line rather than passion.

Trial Court Opinion, 4/12/23, at 15 n.63.

In other words, the jury's mere notation of the name of one of the victims – which it eventually crossed out – does not, in and of itself, demonstrate that the jury's recommended sentence of death for Kaylee's murder was the result of passion or sympathy for Sydney.

Appellant also submits that the fact that the jury deadlocked on the penalty for the murder of Sydney "suggests that the death penalty [for the murder of Kaylee] was the product of prejudice or the consideration of some arbitrary factor." Appellant's Brief at 18. He further contends that the evidence presented under the catch-all mitigator was "numerous and overwhelming," and, thus, the jury's finding that that the sole aggravator outweighed the catch-all mitigator "clearly shows that the sentence of death was the product of passion [or] prejudice and or [was] plain[ly] arbitrary in nature." *Id.*

This Court, however, has repeatedly rejected claims that a sentence of death must be overturned because a jury failed to give sufficient weight to mitigation evidence presented by a defendant, or because the jury improperly weighed any mitigating and aggravating factors. *See Commonwealth v. Diamond*, 83 A.3d 119, 134-35 (Pa. 2013) (a capital jury is not required to find a mitigating circumstance presented by a defendant, and once a jury has been properly instructed on the nature of aggravating and mitigating circumstances as defined in the statute, as well as on the statutory scheme for balancing one against the other, the weighing process is exclusively a question for the fact finder). In the instant case, although the jury found the catch-all mitigator, it concluded that mitigating factor was outweighed by the Section 9711(d)(10) aggravator, a finding within its sole discretion.

Finally, and more broadly, in keeping with our statutory obligation to independently determine whether a sentence of death was the product of passion, prejudice, or any other arbitrary factor, or whether the evidence fails to support the finding of at least one

aggravating circumstance under 42 Pa.C.S. § 9711(d), we first conclude that the jury's recommended sentence of death was not the product of any passion, prejudice or other arbitrary factor. Rather, the evidence established that Appellant killed Sydney and Kaylee by shooting them in the head, with the specific intent to kill them. Next, the Commonwealth proved, beyond a reasonable doubt, as an aggravating factor with respect to Kaylee, that Appellant had "been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable." *Id.* § 9711(d)(10). That prior offense was the fatal shooting of Sydney. Although the jury found a single mitigating circumstance, the "catch-all mitigator," pursuant to Section 9711(e)(8), it concluded that the aggravating circumstance outweighed the mitigating circumstance. As such, Appellant's sentence complies with the statutory mandate for the imposition of a sentence of death. *See id.* § 9711(c)(1)(iv). Accordingly, there are no grounds upon which to vacate Appellant's death sentence pursuant to Section 9711(h)(3).

For all of the above reasons, we affirm Appellant's convictions and sentence of death.

Justices Donohue, Dougherty, Wecht, Mundy, Brobson and McCaffery join the opinion.

Justice McCaffery files a concurring opinion.